IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JASON AARON BURKETT, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL CASE NO. H-08-0266 |
| | § | |
| RICK THALER, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent.[1] | § | |

## RESPONDENT'S ANSWER WITH BRIEF IN SUPPORT

Petitioner Jason Aaron Burkett was convicted of capital murder and sentenced to life imprisonment for having murdered three individuals during the same scheme and course of conduct. Burkett challenges the constitutional validity of his conviction by seeking a writ of habeas corpus; however, the Court should dismiss his petition with prejudice because the claims are procedurally barred and meritless.

## JURISDICTION

Burkett petitions for habeas relief pursuant to 28 U.S.C. § 2254, which provides the Court with jurisdiction over the subject matter and the parties as Burkett was convicted within this Court's jurisdiction.

---

[1]    The previous named respondent in this action was Nathaniel Quarterman. Effective July 15, 2009, Rick Thaler succeeded Quarterman as Director of the Texas Department of Criminal Justice's Correctional Institutions Division. Under Rule 25(d) of the Federal Rules of Civil Procedure, Thaler is automatically substituted as a party.

## PETITIONER'S ALLEGATIONS

Respondent Rick Thaler (the Director) understands Burkett to allege the following grounds for relief:

1.  Burkett is actually innocent;

2.  Denial of due process because the jury was instructed on the law of parties by conspiracy, Tex. Penal Code § 7.02 (b), which:

    a.  expanded the theories upon which the State could obtain a conviction, thus violating Burkett's right to specific notice of the charge against him; and

    b.  reduced the State's burden of proof from "intentionally and knowingly" committing murder to whether the murders were "foreseeable";

3.  Prosecutorial misconduct from the State using perjured testimony against Burkett at trial;

4.  Ineffective assistance of trial counsel based on counsel:

    a.  failing to present Burkett's mother and brother as alibi witnesses; and

    b.  failing to interview Megan Lazrine prior to trial;

5.  Ineffective assistance of appellate counsel for failing to raise the Section 7.02(b) issues on direct appeal.

Docket Entry No. 1, Petition for Writ of Habeas Corpus, pp. 7-8(B);  Docket Entry No. 2, Memorandum in Support of Petition for Writ of Habeas Corpus, pp. 15-60 (Petition or Memorandum herein).

-2-

## GENERAL DENIAL

The Director denies all of Burkett's assertions of fact except those supported by the record or specifically admitted herein.

## STATEMENT OF THE CASE

## I.   Procedural History

Burkett challenges the Director's custody of him pursuant to a judgment and sentence of the 221st District Court of Montgomery County, Texas, in *Jason Aaron Burkett v. State of Texas*, No. 03-07-05136.  3 CR 477-80.[2]  In a two-paragraph indictment, the State charged Burkett with capital murder occurring "on or about October 24, 2001." 1 CR 7.  The State later re-indicted Burkett, charging that he and co-defendant Michael James Perry:

(A)   intentionally caused the death of James Adam Stotler by shooting him during the course of committing or attempting to commit robbery;

(B)   intentionally and knowingly causing the deaths of Arnold Jeremy Richardson and James Adam Stotler during the course of the same criminal transaction;  and

(C)   intentionally and knowingly caused the deaths of Sandra Stotler, James Adam Stotler, and Arnold Jeremy Richardson "during the same scheme and course of conduct."

3 CR 328-29.

---

[2]      "**CR**" is the Clerk's Record of pleadings and documents filed with the trial court in Burkett's capital murder proceedings.  "**RR**" will refer to the Reporter's Record of transcribed trial proceedings and exhibits.

The State proceeded on the third count of the indictment against Burkett to which he entered a plea of not guilty.  17 RR 23-24.  On October 28, 2003, a Montgomery County jury found Burkett guilty as charged.  3 CR 429;  27 RR 118.[3]  After hearing additional evidence on punishment, the jury answered affirmatively the special sentencing issues regarding future dangerousness and the so-called "anti-parties" charge;  however, the jury did not answer the third issue which asked whether sufficient mitigating circumstances existed to warrant a sentence of life imprisonment.  3 CR 472-73, 477-80;  37 RR 218-19.[4]  In accordance with state law, the trial court sentenced Burkett to life imprisonment.  3 CR 477-80; 37 RR 219;  Tex. Code Crim. Proc. art. 37.071, §§ 2(b), (e)(1) & (g).

Burkett's  conviction and sentence were affirmed by the Ninth Court of Appeals of Texas on August 24, 2005.  *Burkett v. State*, 172 S.W.2d 250 (Tex.App.–Beaumont 2005).  The Texas Court of Criminal Appeals refused Burkett's petition for discretionary review on January 25, 2006.  *Burkett v. State*, P.D.R. No. 1612-05.  The United States Supreme Court denied certiorari review on June 26, 2006.  *Burkett v. Texas*, 548 U.S. 911 (U.S. 2006).

---

[3]      In a separate trial, Perry was convicted of capital murder and sentenced to death for having murdered Sandra Stotler in the course of committing burglary. *Perry v. State*, 158 S.W.3d 438, 439 (Tex. Crim. App. 2004).

[4]      The judgment incorrectly reflects that the jury answered "yes" to the third special sentencing issue.  *Compare* 3 CR 474 *with id.* at 479.

On April 12, 2007, Burkett filed an application for state writ of habeas corpus raising eight claims supported by witness statements and other exhibits. 1 SHCR-01, pp. 7-234.[5]  The trial court found that Burkett submitted falsified statements and recommended that the application be denied and that Burkett be cited for abuse of the writ.  2 SHCR-01, pp. 552-58.  The Court of Criminal Appeals agreed, dismissed the initial application as an abuse of the writ, and held that Burkett waived and abandoned any contentions raised therein.  *Ex parte Burkett*, 2007 WL 4126375, No. WR-68,232-01 (Tex. Crim. App.) (unpublished order of Nov. 21, 2007)).

Burkett petitioned for federal habeas relief on January 23, 2008, relying in large part on the same evidence previously found by the state court to have been falsified.  Petition, p. 7; Memorandum, pp. 6-9, 15-20, 23-30, 39-42, 44-45. Burkett later supplemented his petition with an additional exhibit.  Docket Entry No. 8.[6]  In July 2008, the Court granted Burkett's unopposed motion for stay and abeyance in order to allow him to return to state court to exhaust claims based on newly discovered evidence.  Docket Entry Nos. 12, 14.

---

[5]     "**SHCR**" is the State Habeas Clerk's Record—the official records and pleadings filed during Burkett's initial ("**SHCR-01**") or successive ("**SHCR-02**") habeas proceedings.  The SHCR-01 record includes two volumes and eight supplemental volumes.  Citations are preceded by volume or supplemental volume number and followed by page reference where applicable.

[6]     This exhibit does not appear to have ever been presented in state court.

On August 18, 2008, Burkett filed a successive state habeas application raising a claim of actual innocence. SHCR-02, pp. 2-76. The Court of Criminal Appeals dismissed the application with the following order: "Dismissed. Abuse of the writ order previously entered." *Id.* at cover; *Ex parte Burkett*, No. WR-68,232-02 (Tex. Crim. App.) (unpublished order of Sept. 10, 2008).

Burkett returned to federal court, supplemented his petition to include the exhibits submitted with his successive state habeas application, and moved for reinstatement. Docket Entry Nos. 16, 19. The case was reinstated on the Court's docket on January 6, 2009. Docket Entry No. 20. On September 14, 2009, Burkett moved for an evidentiary hearing. Docket Entry No. 31.[7] The Director's answer to Burkett's habeas petition and response opposing Burkett's motion for an evidentiary hearing now follow.

## II.   Statement of Facts

In October 2001, Burkett, Michael James Perry, and Victor Neal were living in a trailer off "Willis-Waukeegan" in Montgomery County. 17 RR 197, 200, 201. None of the three had a car. *Id.* at 239, 240. Burkett's girlfriend, Kristin Willis, would let Burkett use her Chevrolet pickup truck while she was at work. *Id.* at 201-02. One day, Ms. Willis did not show up, and Burkett got fed

---

[7]    On September 24, 2009, the Director received a Motion to Supplement Motion for Evidentiary Hearing and Appointment of Counsel, although it does not appear on the Court's electronic docket.

up with the arrangement.  *Id.* at 239.

Burkett and Mr. Perry started planning to steal a car. 17 RR 240-41.  The two had a Winchester 20-gauge pump-action shotgun.  *Id.* at  203-06, 237-23.  Burkett asked Mr. Neal to purchase "green shells" ammunition at the Wal-Mart store in Conroe because Mr. Neal was old enough to buy them.  *Id.* at 238-39.

The day after Ms. Willis failed to show up, Burkett and Mr. Perry went looking for vehicles to steal.  17 RR 240-41, 242.  Mr. Neal accompanied them to several shopping centers and apartment complexes to find a suitable car and situation, but failed to find the right circumstances.  *Id.* at 243-50.  Burkett got angry and frustrated, and agreed to Mr. Perry's idea of leaving no evidence or witnesses and to disposing of bodies in Crater Lake where things sink and nothing gets found.  *Id.* at 251, 252.

On Wednesday, October 24, 2001, Burkett and Mr. Perry were gone when Mr. Neal got up.  17 RR 253; 18 RR 220, 221-22.  That night, at about 10:00 p.m., Mr. Perry came into a local bar and said, "Come check out our new cars."  17 RR 254.  Burkett was driving a white Isuzu Rodeo and Mr. Perry was driving a red Camaro.  17 RR 254; 18 RR 222, 223-24.  Burkett explained that they had scratched off a lottery ticket and won $7,000 to buy the cars.  17 RR 255; 18 RR 223.  Later that night, however, Burkett told Mr. Neal that they had stolen the vehicles.  17 RR 257.

On Thursday, October 25, 2001, between 6:00 and 8:00 p.m., Burkett, Mr. Perry, and Ms. Willis arrived at the tattoo shop owned by Shane Atkinson. 18 RR 238, 242, 245; 19 RR 50. They were driving newer vehicles, "a red Camaro and a white Isuzu Rodeo." 18 RR 246. Mr. Atkinson asked how they got the vehicles, and Burkett said that "they had won the lottery," "hit for 7,000 and they put $3,000 apiece down on the vehicles." *Id.* at 246. When Mr. Atkinson said "[h]e didn't believe" how they had gotten the vehicles, Mr. Perry said "they had killed some people and stole the cars." *Id.* at 247.

Mr. Atkinson got "kind of a nervous feeling," called Burkett over to the side, and asked Burkett what happened. 18 RR 247. Burkett told Mr. Atkinson that "they had gone to a friend of theirs [sic] house and he had gone and knocked on the front door." *Id.* at 248. "[Burkett] said he needed to use the phone because his car had broke down," and that he went "through the front door. The lady allowed him in." *Id.* at 250. Mr. Perry "[w]ent around the back and knocked on the back door." *Id.* [Burkett] heard a knock on the back door and heard some shots. *Id.* at 249. "[T]hey looked for some keys or something to some vehicles and they couldn't find them." *Id.*

Burkett told Mr. Atkinson that he and Mr. Perry "waited for some boys" when they couldn't find the keys. 18 RR 251. They told the boys "something about that they had a mutual friend that had got hurt in the woods and they

needed them to come help get him out of the woods." *Id.* Burkett "took them out in the woods" and "shot the one boy because it was Michael Perry's friend and Michael Perry said he couldn't do it." *Id.* Burkett shot the other boy because "he had seen him do it, so he had to shoot him, too." *Id.* Burkett said the "deal" was that "Perry was to kill the mom and he was to kill the son." *Id.* at 252.

On Saturday, October 27, 2001, a body was found in Crater Lake by a fisherman. 19 RR 115. The body was later identified as Sandra Stotler. 17 RR 66. Ms. Stotler was wrapped in a sheet, blanket, and comforter, which matched the bedding in the master bedroom of her home. *Id.* at 53, 65; 20 RR 44-45. She had a large shotgun wound, approximately four inches in diameter, to her middle back and no exit wound. 17 RR 54-57, 72. Two plastic shotgun waddings were found in the wound, consistent with two wounds in the same location, and a shotgun being fired twice at less than ten feet. *Id.* at 56-57; 22 RR 81.

The following Monday, October 29, 2001, Burkett held a copy of the Conroe Courier with an article headlined, "Unknown Body Found in Crater Lake," and bragged to friends, "Look, we made the front page." 19 RR 275, 276, 277, 278, 335-36.

Burkett and Mr. Perry were arrested on Tuesday, October 30, 2001, before 7:00 a.m. after hitting a patrol officer and crashing the white Isuzu Rodeo into a building. 17 RR 98-99; 22 RR 158, 166-67. The bodies of 16-year-old James

Adam Stotler and 18-year-old Jeremy Richardson were then located in a heavily wooded area.  17 RR 104, 105, 113; 19 RR 100; 22 RR 222.  Both had died from multiple shotgun wounds.  *Id.* at 35-36, 91.

Shotgun shell casings recovered from Ms. Stotler's residence and near the bodies of both boys had been fired from the shotgun retrieved at the time of Burkett's arrest.  24 RR 10-14, 26.  The shotgun had blood on it, which DNA testing matched to Burkett.  23 RR 44, 232-33.

Shoeprint casts made from prints near the bodies of the boys and a latent shoeprint located in Ms. Stotler's residence could have been made by the same shoe.  20 RR 136; 21 RR 112-13, 127, 247, 250.  A sock-clad left foot impression was also located near Adam Stotler's body.  21 RR 133, 237.  Burkett could not be excluded as the person who made the sock impression.  *Id.* at 255-58.

## RECORDS

Records of Burkett's trial, appeal, and state habeas proceedings have been forwarded to the Court.

## EXHAUSTION/LIMITATIONS/SUCCESSIVE PETITION

Burkett has exhausted his state court remedies on the above claims as construed by the Director.[8]  Nevertheless, Burkett's claims are procedurally

---

[8]   The Director reserves the exhaustion and procedural default defense should Burkett disagree with the Director's construction of the claims presented.

defaulted because he abused the writ of habeas corpus during state collateral proceedings.  Burkett's petition is not barred by limitations, 28 U.S.C. § 2244(d), or subject to the successive petition bar, 28 U.S.C. § 2244(b).

## ANSWER

Burkett's petition is governed by the standard of review provided by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  28 U.S.C.A. § 2254; *Lindh v. Murphy*, 521 U.S. 320, 336 (1997) (holding AEDPA only applies to those noncapital habeas corpus cases filed after its effective date of April 24, 1996).  Pursuant to AEDPA, a federal court:

> may not issue a writ of habeas corpus for a defendant convicted under a state judgment unless the adjudication of the claim by the state court "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding."

*Riddle v. Cockrell*, 288 F.3d 713, 716 (5th Cir. 2002) (quoting 28 U.S.C. § 2254(d)(1)-(2)).

The Supreme Court has explained that a state-court decision is "contrary" to established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Court's] cases," or confronts facts that are "materially indistinguishable" from a relevant Supreme Court precedent, yet reaches an opposite result.  *Williams v. Taylor,* 529 U.S. 362, 405-06 (2000).

Alternatively, a state court "unreasonably applies" clearly established federal law if it correctly identifies the governing precedent but unreasonably applies it to the facts of a particular case. *Id.* at 407-09.

A federal habeas court's inquiry into unreasonableness should be objective rather than subjective, and a court should not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. *Williams,* 529 U.S. at 409-11. Rather, federal habeas relief is only merited where the state-court decision is both incorrect and objectively unreasonable, "whether or not [this Court] would reach the same conclusion." *Woodford v. Visciotti,* 537 U.S. 19, 27 (2002); *Williams,* 529 U.S. at 411. As the Court has explained,

> the range of reasonable judgment can depend in part on the nature of the relevant rule. If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations.

*Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004).

Moreover, it is the state court's "ultimate decision" that is to be tested for unreasonableness, "not every jot of its reasoning." *Santellan v. Cockrell,* 271

-12-

F.3d 190, 193 (5th Cir. 2001); *see also Neal v. Puckett,* 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (holding that a federal court's "focus on the 'unreasonable application' test under section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence").   Reasonableness does not require citation to, or even awareness of, any particular Supreme Court precedent, so long as the result of the state-court decision does not contradict that precedent. *Early v. Packer,* 537 U.S. 3, 8 (2002).

AEDPA provides that the state court's factual findings "shall be presumed to be correct" unless the petitioner carries "the burden of rebutting the presumption of correctness by clear and convincing evidence."   28 U.S.C. § 2254(e)(1).   "The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell,* 274 F.3d 941, 948 n.11 (5th Cir. 2001).

Finally, pre-AEDPA precedent forecloses habeas relief if a claim (1) is procedurally barred as a consequence of a failure to comply with state procedural rules, *Coleman v. Thompson*, 501 U.S. 722 (1991); (2) seeks retroactive application of a new rule of law to a conviction that was final before the rule was announced, *Teague v. Lane*, 489 U.S. 288 (1989); or (3) asserts trial error that,

although of constitutional magnitude, did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citation omitted).

## I.    Burkett's Claims Are Defaulted on Federal Review.

During his initial state habeas proceedings, Burkett submitted witness statements to support his claims of actual innocence, prosecutorial misconduct, and ineffective assistance.  1 SHCR-01, pp. 7-234.  The trial court found that several of the statements were falsified.  2 SHCR-01, pp. 552-58.  Because Burkett relied on falsified statements, the Court of Criminal Appeals held that he abused the writ and, therefore, dismissed Burkett's initial and successive state habeas applications.  Under the "plain statement" rule, those claims are now defaulted.

### A.    Burkett's state habeas (and now federal habeas) evidence is falsified.

In his initial state habeas application, Burkett raised a claim of actual innocence on the basis of the alleged statements of Kristin Willis, Megan Lazrine, Cathy Lazrine, and Michael Perry.  1 SHCR-01, pp. 12, 21-24.  He also provided statements from Kathryn Burkett (his mother) and Christopher Burkett (his brother).  *Id.* at 24-25.  He raises the same claim with the same evidence in this Court.  *Compare id. with* Petition, p. 7 & Memorandum, pp. 15-18.  The state court found that Burkett falsified the four statements, and that

he suborned perjury by presenting the two affidavits from family members.  *E.g.*, 2 SHCR-01, pp. 553-54 (Findings of Fact [FF] 8-16).  This Court should reject Burkett's evidence, sanction him for his continued abuse of the writ of habeas corpus, and perhaps consider additional criminal penalties.

### 1.    Burkett's evidence

Relying on the statement of **<u>Kristin Willis</u>**, Burkett contends that she recants her trial testimony: "all of the past testimony that [she] gave [is]100 percent false," and that Burkett was never with her and co-defendant Michael Perry on the night of the murders.  Willis's statement includes that she testified to everything that the detective and her stepfather, a Montgomery County Sheriff's deputy, wanted her to say at trial. 1 SHCR-01, pp. 21-22, 53-57 (Burkett's Exhibit #1);  *see* Memorandum, pp. 15-16  (citing same evidence in this Court on federal habeas review).

Next, Burkett points to the statement of **<u>Megan Lazrine</u>** when he contends avers that she knows nothing of Burkett's involvement in any murders; that testimony about Burkett having admitted to shooting someone was "a lie";  that lead prosecutor Robert Bartlett threatened to put her in jail if she did not testify as he instructed; that Bartlett came to her parent's home on one occasion, assaulted her, handcuffed her, and told her that "after you get beat up and raped a couple of times, you will know how to cooperate";  that Bartlett told her to

testify to those lies or that she would go to jail for life; and that she was scared and did what he wanted. 1 SHCR-01, pp. 22-23, 58-66 (Burkett's Exhibit #2); *see* Memorandum, pp. 16-17 (same evidence in federal court).

Relying on a statement from **<u>Cathy Lazrine</u>**, Burkett contends that Ms. Lazrine verifies that some of the things the detective was trying to get Megan Lazrine (her daughter) to say were lies, and that Megan "told her of the threats and sexual advances by Robert Bartlett." 1 SHCR-01, pp. 23, 67-68 (Burkett's Exhibit #3); *see* Memorandum, p. 17 (same in federal court).

Burkett also points to the statement of co-defendant **<u>Michael Perry</u>** in which Perry asserts that Burkett "had absolutely nothing to do with the crimes"; that Perry was alone when he killed Sandra Stotler, that Burkett was working when Perry killed Sandra Stotler; that Perry was with Kristin Willis when he shot and killed Adam Stotler and Jeremy Richardson; and that Kristin Willis helped him dump Sandra Stotler's body at Crater Lake. 1 SHCR-01, pp. 23, 69-73 (Burkett's Exhibit #4); *see* Memorandum, p. 17 (same in federal court).

Additionally, Burkett provides statements from Kathryn Burkett (his mother) and Christopher Burkett (his brother). According to **<u>Kathryn Burkett</u>**, on October 24, 2001, Jason came by to get some laundry done; that he left later with his brother Chris saying "he was going back to work with his brother"; and that the two came home together around 7:30 pm to get Jason's laundry, and

stayed for half-an-hour before leaving.  1 SHCR-01, pp. 24, 79-81  (Burkett's Exhibit #6);  *see* Memorandum, p. 18 (same in federal court).  **Christopher Burkett** states that he went to work for Grady Page on October 24, 2001;  that when he went to his mother's home for lunch, Jason was there;  that he took Jason back to work with him;  that when he left work to go home, he took Jason by their mother's house so that Jason could pick up his laundry;  and that he dropped Jason off at the trailer around 8:00 pm.  He also states:

> Between 1:00 - 2:00 p.m. and until around 8:00 p.m. on October 24, 2001, Jason was with me, and working on the job site.  At no time did Jason leave the job, or go out of my sight.  We all worked together that day.  It was myself, Jason, Grady  (the owner of the company, Surface Prep) and another coworker.

1 SHCR-01, pp. 24-25, 82-83 (Burkett's Exhibit #7);  *see* Memorandum, p. 18 (same evidence in federal court).

### 2.    State's investigation of Burkett's evidence

Concurrent with filing his initial state habeas application, Burkett moved the trial court for a protective order preventing the State from contacting any of the witnesses.  1 SHCR-01, pp. 238-42.  After the habeas court denied Burkett's motion, *id.* at 243, the district attorney's investigator Heather Cash met with witnesses to verify the statements submitted by Burkett.

On August 2, 2007, Cash interviewed Megan (Lazrine) Gray and her mother Cathy Lazrine, and provided them with copies of the statements

submitted by Burkett.  2 SHCR-01, p. 550.  Both women denied ever having written the affidavits.  *Id.* at 550-51.  In a notarized, handwritten statement written at the end of their alleged affidavit, Megan (Lazrine) Gray states:  "I Megan Gray have read this statement and nothing in here is true.  I have never written or even seen this before."  *Id.* at 411-19 (State's Exhibit B).  Cathy Lazrine states:  "I have read this affidavit and nothing in it is truthful.  I have <u>never</u> written or verbally stated any of the things above."  *Id.* at 420-21 (State's Exhibit C).  Cathy Lazrine informed investigator Cash that Burkett obtained their signatures by sending them forms to sign so that he could provide them with the transcription of the trial, and he told them that they may be able to help him with his appeal.  *Id.* at 551.  According to investigator Cash, the women were both angry about the statements being written containing false information, and having what appeared to be their signatures on them.  *Id.*

Kristin Willis was also interviewed and denied making the statement.  She provided a notarized, handwritten statement written at the end of her alleged affidavit presented by Burkett, attesting that:  "I do not have any knowledge of this statement.  I never wrote this statement."  2 SHCR-01, pp. 406-10 (State's Exhibit A).

Additionally, prosecutor Robert Bartlett provided his affidavit denying the allegations in Megan Lazrine's alleged affidavit.  2 SHCR-02, pp. 422-26 (State's

Exhibit D).   Mr. Bartlett's affidavit is corroborated by Assistant District Attorney Michael Griffin, who  presented the State's case against Burkett with Mr. Bartlett.   *Id.* at 427-29 (State's Exhibit E).   Mr. Griffin states that Ms. Lazrine showed no fear of Mr. Bartlett and that her testimony was spontaneous. The habeas court, familiar with the performance of the trial prosecutors as both "have effectively prosecuted cases in the 221st District Court and the courts of Montgomery County for many years," found the affidavits of Robert Bartlett and Michael Griffin credible.  2 SHCR-01, p. 554 (FF 20-21).

The State also received a  copy of Michael Perry's affidavit was filed in federal  court in *Perry v. Quarterman*, No. 4:07-cv-01032 (S.D. Tex.).  2 SHCR-01, pp. 430-61 (State's Exhibit F).   Mr. Perry states in his affidavit: "Jason Burkett submitted a forged statement in support of his state habeas petition, purporting to bear my signature, that falsely states that I committed the crimes for which Jason Burkett has been convicted."   *Id.* at 432.   Mr. Perry further states: "I did not draft or sign the attached forged statement.  I did not know that the forged statement existed until it was forwarded to me by my investigator in early December 2006, when I saw it for the first time."  *Id.*

Based on the credible affidavit testimony of the witnesses, the state habeas court found that Burkett submitted the false affidavits of Kristin Willis, Megan Lazrine, Cathy Lazrine, and Michael Perry.  2 SHCR-01, pp. 553-54 (FF

8-11).  The court also found that Burkett abused the writ of habeas corpus by presenting false evidence, and that his lawsuit is frivolous.  *Id.* (FF 12-13).

The State's investigation also revealed that Burkett suborned perjury in presenting the affidavits of his mother Kathryn Burkett and brother Christopher Burkett.  Both claimed Jason went to work with Christopher on October 24, 2001, and stayed with him until mid-evening, and Christopher Burkett said he was working that day for Grady Page. 1 SHCR-01, pp. 24-25, 79-83 (Burkett's Exhibits ##6-7).  However, Mr. Page submitted an affidavit stating that Burkett did not work for him at the time of the murders and that he told Burkett's family and friends that he would testify that Burkett had worked for him, but not on the day of the murders because "that's a lie." 2 SHCR-01, pp. 462-64 (State's Exhibit G).

The state habeas court found that Burkett was not working for Page at the time of the murders, and that Burkett suborned perjury in filing the affidavits of his mother and brother.  2 SHCR-01, pp. 553-54 (FF 14-16).  Finally, the court found that Burkett commits perjury in pleading, and suborns perjury in the proof of, his claim that counsel failed to present his alibi defense that he was working.  *Id.* at 556 (FF 35).

## B.  The Texas court expressly dismissed Burkett's habeas applications on state law grounds and, in turn, the claims are defaulted.

After considering Burkett's initial application, the state court

recommended that relief be denied and that the Court of Criminal Appeals find Burkett abused the writ of habeas corpus. 2 SHCR-01, pp. 552-58. Specifically, the court found *inter alia* that Burkett filed falsified statements and suborned perjury; that Burkett filed a frivolous lawsuit; that, apart from falsified statements, Burkett presented no evidence to support his claims of actual innocence and prosecutorial misconduct; and that, based on the credible affidavits of trial counsel and appellate counsel, Burkett failed to prove his claims of ineffective assistance. *Id.*

By written order, the Court of Criminal Appeals dismissed Burkett's habeas application:

> In his present application, Applicant raises eight grounds challenging his conviction. This application, however, presents a more serious question. Applicant alleges, among other things, that he is actually innocent. In support of his allegation, he has submitted documents purporting to be affidavits from Kristin Willis, Megan Lazrine, Cathy Lazrine, and Michael Perry. The trial court has found that these affidavits are fabricated.
>
> The writ of habeas corpus is not to be lightly or easily abused. *Sanders v.* [*United States*], 373 U.S. 1 (1963); *Ex parte Carr*, 511 S.W.2d 523 (Tex. Crim. App. 1977). We find that Applicant has abused The Great Writ by submitting false evidence. By that abuse, Applicant has waived and abandoned any contention that he might have in regard to the instant conviction, at least insofar as existing claims that he could have or should have brought in this application. *Ex parte Jones*, 97 S.W.3d 586 (Tex. Crim. App. 2003); *Middaugh v. State*, 683 S.W.2d 713 (Tex. Crim. App. 1985); *Ex parte Emmons*, 660 S.W.2d 106 (Tex. Crim. App. 1983). Additionally, based on Applicant's submission of false evidence, we find that Applicant has filed a frivolous lawsuit. We dismiss this application.

*Ex parte Burkett*, 2007 WL 4126375, No. WR-68,232-01 (Tex. Crim. App.) (unpublished order of Nov. 21, 2007)).  The court also instructed the Clerk of the of the Court of Criminal Appeals:

> not to accept or file the instant application for a writ of habeas corpus, or any future application attacking this conviction unless Applicant shows in such an application that any claims presented have not been raised previously and that they could not have been presented in a previous application for a writ of habeas corpus.

*Id*. (citing *Ex parte Bilton*, 602 S.W.2d 534 (Tex. Crim. App. 1980)).

When Burkett subsequently returned to state court to file a successive habeas application raising a claim of actual innocence based on newly discovered evidence, the Texas court dismissed the application and expressly cited the abuse of the writ order set forth above.  SHCR-02 at cover.

Federal courts are barred from reviewing questions of constitutional law where the last state court considering the claim expressly relies on a state ground for denying relief, and that ground is both independent of the merits of the federal claim and an adequate basis for the court's decision.  *Coleman*, 501 U.S. at 729-30; *Wainwright v. Sykes*, 433 U.S. 72, 81, 87 (1977).  In Burkett's case, the Court of Criminal Appeals delivered a plain statement of its reliance on state law grounds—a statement which makes clear that the dismissal of Burkett's initial and subsequent habeas applications is procedural in nature. Consequently, the Court is barred from reaching the merits of Burkett's claims.

## C.   Burkett fails to overcome the procedural default.

Procedural default may be overcome by establishing cause and prejudice, or a fundamental miscarriage of justice.  *Coleman*, 501 U.S. at 750.   Burkett cannot make either showing.

Cause "must be something *external* to the petitioner, something that cannot be attributable to him."  *Coleman*, 501 U.S. at 750.  Yet nothing external to Burkett prevented him from complying with state procedural rules or caused him to file falsified statements to support his initial habeas application.  "Absent a showing of cause, it is not necessary for the Court to consider whether there is actual prejudice."  *Martin v. Maxey*, 98 F.3d 844, 849 (5th Cir. 1996).

Alternatively, a petitioner may establish his "actual innocence" of the crime for which he is convicted such that the court's failure to address defaulted claims would result in a fundamental miscarriage of justice.  *Schlup v. Delo*, 513 U.S. 298, 324 (1995).  To establish the requisite probability that he was actually innocent, Burkett "must support his allegations with new, reliable evidence that was not presented at trial and show that it was 'more likely than not that no reasonable juror would have convicted him in the light of the new evidence.'" *Fairman v. Anderson,* 188 F.3d 635, 644 (5th Cir.1999) (citing *Schlup ,* 513 U.S. at 327).  Examples of new, reliable evidence that may establish factual innocence include exculpatory scientific evidence, credible declarations of guilt by another,

trustworthy eyewitness accounts, and certain physical evidence. *Id.* (citing *Schlup*, 513 U.S. at 324, and *Sawyer v. Whitley*, 505 U.S. 333, 340 (1992)).

In his federal petition, Burkett raises a "*Schlup* Claim" and argues that his innocence is "tied to a showing of constitutional error at trial"—in this case, that the State threatened and coerced witnesses who testified falsely against him at trial. Memorandum, pp. 23-24.[9]  Importantly, he does not argue the claim as a gateway which would allow the Court to reach his procedurally defaulted claims. Instead, he presents it as part of his freestanding claim of actual innocence for which he seeks habeas relief.  *See id.*  The Court should not construe Burkett's claim to assert a fundamental miscarriage of justice and, so his claims should remain defaulted.

Even if Burkett's *Schlup* claim is asserted to overcome his default, the Court should reject the argument.  First, Burkett fails to present "new, reliable evidence that was not presented at trial." *Fairman,* 188 F.3d at 644 (citing *Schlup* , 513 U.S. at 327).  Instead, his evidence consists largely of falsified

---

[9]     In a section entitled "Denial of Due Process," Burkett asserts that the Texas court's "ignored" his motions, that the habeas court adopted the State's proposed findings of fact and conclusion of law as "gospel," and refused to conduct a hearing. DE 2 – Memorandum, pp. 25-30.  These arguments have nothing to do with actual innocence or excusing his default, and complaints about the habeas system or purported "infirmities" in habeas proceedings "do not constitute grounds for federal habeas relief.'" *Moore v. Dretke,* 369 F.3d 844, 846 (5th Cir. 2004) (quoting *Duff-Smith v. Collins,* 973 F.2d 1175, 1182 (5th Cir.1992)); *see Henderson v. Cockrell,* 333 F.3d 592, 606 (5th Cir. 2004).

statements and his "scientific evidence"—which consists of an investigator's "report" regarding insect activity and decomposition, and a proposed timeline of events—is neither new or reliable.  Docket Entry No. 16, Second Supplement, at Exhibits A & B.

Insect evidence was discussed at trial when defense counsel elicited from State's witness Paul Schrode, the medical examiner, that he found evidence of insect activity in and around the bodies, but never called an entomologist to examine the insects.  22 RR 76-78.  Defense counsel also presented forensic pathologist Dr. Joseph Guilardo who explained the purpose of preserving insect evidence and testified that such preservation did not occur here.  26 RR 83-85.  Furthermore, Burkett's new timeline of events is comprised of the confession of co-defendant Perry, a time sheet, and several maps— all of which were clearly available prior to trial.  Docket Entry No. 16, Second Supplement, at Exhibit B.  Assuming Burkett's scientific evidence is admissible (which is doubtful at best), it is not the type of new and reliable evidence contemplated by *Schlup*.

Second, Burkett cannot establish that had the jury considered the alleged new evidence, that it is "more likely than not that no reasonable juror would have convicted him" of capital murder.  *Fairman,* 188 F.3d at 644 (citing *Schlup*, 513 U.S. at 327).  The evidence against Burkett, described in the Statement of Facts section above, includes that Shane Atkinson testified that Burkett told

him that he had participated in the murder of a lady and shot two boys.  18 RR 248-51.  Burkett told Mr. Atkinson that the "deal" was that "Perry was to kill the mom and he was to kill the son."  *Id.* at 252.  Burkett's statements to Mr. Atkinson match the crime scene evidence and circumstances of the deaths of Ms. Stotler, Adam Stotler, and Jeremy Richardson.

Burkett's statements are also consistent with the confession given by co-defendant Michael Perry to law enforcement officers shortly after his arrest.  2 SHCR-01, pp. 465-71 (State's Exhibit H).  Although not admissible at his jury trial, Mr. Perry's statement led to the recovery of the bodies of Adam Stotler and Jeremy Richardson.  *Id.* at 472-74 (State's Exhibit I).  On this record, Burkett cannot establish actual innocence sufficient to justify a miscarriage of justice exception, assuming such a claim was even properly before the Court.   As a result, Burkett's claims remain defaulted from federal habeas review.

## II.   Even If The Claims Are Not Defaulted, They Do Not Warrant Relief.

Burkett's state habeas applications were correctly dismissed because he abused the writ of habeas corpus, and his own actions resulted in the claims being defaulted from federal court review.  This Court should not hesitate to deny Burkett's petition because all the claims are barred, and because he cannot overcome the default.   Yet even if the Court decided to excuse his default (which it should not), the claims raised do not warrant habeas relief.

## A.   Claims of actual innocence is not cognizable on federal review.

Burkett argues that he is actually innocent of the crime for which he was convicted.   Memorandum, pp. 15-30.   He insists that statements from Kristin Willis, Megan Lazrine, Cathy Lazrine,  Michael Perry, Robert Pierce, Kathryn Burkett, and Christopher Burkett establish that he had nothing at all to do with the crimes.   *Id.* at 15-18;  1 SHCR-01 at 53-83 (Burkett's Exhibits ##1-7).   He also contends that his "newly discovered scientific evidence" refutes the State's proposed time of death and timeline of events.   Docket Entry No. 16, Second Supplement.   As explained above, the majority of Burkett's evidence is falsified.   In any event, Burkett fails to raise a claim on which the Court could grant relief.

"Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."   *Herrera v. Collins,* 506 U.S. 390, 400 (1993).   The Fifth Circuit does not recognize freestanding claims of actual innocence.   *In re Swearingen*, 556 F.3d 344, 348 (5th Cir. 2009) (citing *Graves v. Cockrell*, 351 F.3d 143, 151 (5th Cir. 2003) (collecting cases)); *Foster v. Quarterman*, 466 F.3d 359, 367-68 (5th Cir.2006).   To the extent Burkett wants the Court to issue a new rule of law finding that such a claim is ground for federal relief, then the Court is foreclosed from doing so by *Teague v. Lane*, 489 U.S. at 310.

**B.     No constitutional error arose from the jury charge instruction regarding Texas Penal Code, Section 7.02.**

Burkett alleges that he was denied due process of law by this charge because of the inclusion of the instructions regarding a conspiracy.  Specifically, he complains that by allowing the instruction on conspiracy—in tandem with the instruction on the law of the parties—he was not provided with adequate notice of the charges against him, and the State was allowed to obtain a conviction on a lesser burden of proof.  Petition, p. 7; Memorandum, pp. 31-38.  As set forth in Part I, *supra*, this claim is procedurally barred and should be denied for that reason alone.  In any event, this claim is entirely without merit.

At the time Burkett committed the capital offense, Section 7.02(b) of the Texas Penal Code provided:

> If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

Tex. Penal Code, § 7.02(b) (West 2000).  Pursuant to this statute, Burkett's jury was informed of the law of conspiracy as follows:

> In the attempt to carry a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

Capital murder, murder, and robbery are felonies. . . . .

3 CR 416. The jury was charged that it could find Burkett guilty of capital murder as an individual actor or as a party based on the law of conspiracy, and it was instructed:

> Now if you find from the evidence beyond a reasonable doubt that on or about October 24, 2001, in Montgomery County, Texas, the defendant, JASON AARON BURKETT, conspired with Michael James Perry to commit robbery, and Michael James Perry, did then and there intentionally or knowingly cause the death of Sandra Stotler by shooting Sandra Stotler with a deadly weapon, to wit: a firearm, and that you further find from the evidence beyond a reasonable doubt that on or about October 24, 2001, in Montgomery County, Texas, and pursuant to the same scheme or course of conduct, Michael James Perry, did then and there intentionally or knowingly cause the death of James Adam Stotler or Arnold Jeremy Richardson with a deadly weapon, to wit: a firearm, and you further find that the said shooting of Sandra Stotler and James Adam Stotler or Arnold Jeremy Richardson by Michael Perry was done in furtherance of the conspiracy to commit robbery and should have been anticipated as a result of the carrying out of the conspiracy; **OR**
>
> if you find from the evidence beyond a reasonable doubt that on or about October 24, 2001, in Montgomery County, Texas, the defendant, JASON AARON BURKETT, conspired with Michael James Perry to commit robbery, and that the defendant, JASON AARON BURKETT, did then and there intentionally or knowingly cause the death of Sandra Stotler by shooting Sandra Stotler with a deadly weapon, to wit: a firearm, and that you further find from the evidence beyond a reasonable doubt that on or about October 24, 2001, in Montgomery County, Texas, and pursuant to the same scheme or course of conduct, Michael James Perry, did then and there intentionally or knowingly cause the death of James Adam Stotler or Arnold Jeremy Richardson by shooting James Adam Stotler or Arnold Jeremy Richardson with a deadly weapon, to wit: a firearm, and you further find that the said shooting of Sandra

-29-

Stotler by the defendant and the said shooting of James Adam Stotler or Arnold Jeremy Richardson by Michael Perry was done in furtherance of the conspiracy to commit robbery and should have been anticipated as a result of the carrying out of the conspiracy; **OR**

if you find from the evidence beyond a reasonable doubt that on or about October 24, 2001, in Montgomery County, Texas, the defendant, JAMES AARON  BURKETT, conspired with Micheal James Perry to commit robbery, and that Michael James Perry, did then and there intentionally or knowingly cause the death of Sandra Stotler by shooting Sandra Stotler with a deadly weapon, to wit: a firearm, and that you further find from the evidence beyond a reasonable doubt that on or about October 24, 2001, in Montgomery County, Texas, and pursuant to the same scheme or course of conduct, the defendant, JAMES AARON BURKETT, did then and there intentionally or knowingly cause the death of the James Adam Stotler or Arnold Jeremy Richardson with a deadly weapon, to wit: a firearm; and you further find that the said shooting of Sandra Stotler by Michael James Perry and the said shooting of James Adam Stotler or Arnold Jeremy Richardson by the defendant, JASON AARON BURKETT, was done in furtherance of the conspiracy to commit robbery and should have been anticipated as a result of the carrying out of the conspiracy;

then you will find the defendant, JAMES AARON BURKETT, guilty of Capital Murder as charged in the indictment. . . .

3 CR 420-21 (emphasis by court).

Burkett initially contends that the jury instruction violated due process expanded the theories upon which the State could obtain a conviction, thus violating his right to specific notice of the charge against him.  In *Montoya v. State*, the appellant made the same allegation as Burkett.  810 S.W.2d 160, 165 (Tex. Crim. App. 1989).  The Court of Criminal Appeals held that the appellant

was mistaken in that the court's charged did not instruct the jury on a separate offense, but was a proper "alternate 'parties' charge as provided in [Texas Penal Code, Section 7.02(b)]." *Id.* The court went on to note, "It is well accepted that the law of parties may be applied to a case even though no such allegation is contained in the indictment," and that Section 7.02(b) had been applied in many capital murder cases. *Id. Montoya* remains good law in Texas. Further, the record in this case clearly supports a finding by the jury that Burkett and Perry did in fact conspire to rob and that three murders were committed in furtherance of that conspiracy.

In his second complaint, Burkett contends that the 7.02(b) instruction reduced the State's burden of proof from "intentionally and knowingly" committing murder to whether the murders were "foreseeable." This argument, too, has been addressed, and rejected, by the state courts. *See Cienfuegos v. State*, 113 S.W.3d 481 (Tex. App. —Houston [1st Dist.] 2003, pet. ref'd). In that case, the appellant argued "that allowing a capital murder conviction 'under the guise of the conspiracy theory of parties [Section 7.02(b) of the Penal Code]' violates constitutional due process requirements 'by impermissibly dispensing with any intent whatsoever.'" *Id.* at 493. In rejecting the claim, the appellate court wrote:

> [C]ontrary to appellant's assertion, [S]ection 7.02(b) does not dispense with the requirement of a culpable mental state in regard

to a capital murder conviction under the law of parties. It provides that if, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, "all conspirators are guilty of the felony actually committed, though having no intent to commit it, *if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as result of the carrying out of the conspiracy.*" [Tex. Penal Code § 7.02(b)]. (emphasis added).

The Third Court of Appeals has held that Section 7.02(b) does not lack a mens rea requirement and is not facially unconstitutional in regard to defendants convicted of capital murder as conspirators to commit other felonies. *Gravis v. State*, 982 S.W.2d 933, 938 (Tex. App.—Austin, 1998, pet. ref'd). The Court reasoned that:

> While this section allows criminal responsibility for the conduct of another, thereby eliminating the necessity for proof of intent to commit the felony actually committed [capital murder], it does not excuse the state from providing a culpable mental state. In fact, the statute requires the state to show the defendant had *both* the mens rea to engage in a conspiracy and the culpable mental state to commit the underlying, i.e, the intended felony. The mental state required for the underlying felony supplies the mens rea for the felony actually committed by the co-conspirator. *Id.*

*Id.* at 493-94.

In this case, the evidence shows that Sandra Stotler, Adam Stotler, and Jeremy Richardson were murdered because Burkett and Perry wanted to their own cars. 17 RR 239, 240-41. Burkett and Perry had a Winchester 20-gauge pump-action shotgun, asked Victor Neal to buy ammunition for it, and planned to leave no evidence or witnesses and to dispose of the bodies in Crater Lake. *Id.*

at 203-06, 238-39, 251, 252.  The evidence establishes beyond a reasonable doubt that Burkett and Perry formed a conspiracy to commit robbery and murder to obtain their cars.  Murder was not only reasonably foreseeable, it was one of the felonies that Burkett and Perry intended to commit if needed.  The evidence clearly supported the submission of a charge on criminal responsibility pursuant to Texas Penal Code, Section 7.02(b).  *Montoya*, 810 S.W.2d at 165.  For these reasons, Burkett is not entitled to federal habeas relief on this claim.

### C.    Burkett's claim of prosecutorial misconduct is unsupported.

As his third ground for relief, Burkett argues that prosecutors knowingly used perjured testimony or tampered with its witnesses at Burkett's trial. Petition, p. 7; Memorandum, pp. 31-38.  "A state denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected."  *Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir. 1996) (citing *Giglio v. United States*, 405 U.S. 150 (1972), and *Napue v. Illinois*, 360 U.S. 264 (1959)).  In order to show that the State failed to correct false and misleading testimony, Burkett must demonstrate (1) "the testimony was actually false," (2) "the [S]tate knew it was false," and (3) "the testimony was material." *Faulder*, 81 F.3d at 519.  Burkett entirely fails to make this showing.

Burkett bases his instant claim on the alleged affidavits of Kristin Willis, Megan (Lazrine) Gray, Cathy Lazrine, and Michael Perry.  Memorandum, pp.

15-18, 31-38.  As described in Part I.A., *supra*, each of the affidavits submitted by Burkett was falsified.  The State obtained affidavits from these individuals attesting that they never made the statements which Burkett attributed to them.  The State also obtained affidavits from the prosecutors refuting any claims of threats or coercion.   Finally, the district attorney's investigator submitted affidavit testimony regarding her verification of Burkett's statements. 2 SHCR-01, pp. 406-61 (State's Exhibits A-F);  *id.* at 548-51.  Burkett's falsified statements are not proof of prosecutorial misconduct, therefore, his unsupported claim should be summarily rejected.

### D.   Trial counsel were not ineffective.

Burkett argues the his trial counsel failed to present his mother and brother to testify as alibi witnesses, and failed to interview Megan Lazrine prior to trial. Petition, p. 8; Memorandum, pp. 42-45.  To prevail on a claim of ineffective assistance, Burkett must affirmatively prove that (1) in light of all the circumstances as they appeared at the time of the conduct, "counsel's representation fell below an objective standard of reasonableness," *i.e.*, "prevailing professional norms;" and (2) the resultant prejudice was "so serious as to deprive him of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687-90 (1984);  *Bell v. Cone*, 535 U.S. 685, 695 (2002). Burkett cannot establish either element which is fatal to his claim. *Id.*

### 1.   Failure to present alibi witnesses

Initially, Burkett asserts that counsel failed to present known alibi witnesses at trial. Petition, p. 8.  According to Burkett, his mother and brother would testify that he was with them on the day of the murders, as evidenced by their affidavits.  Memorandum, p. 18, 44; 1 SHCR-01, pp. 78-83 (Burkett's Exhibits ##6-7).  He also asserts that his attorneys did not want to present this alibi defense.  *Id.*  This claim is meritless.

Defense trial counsel provided affidavit testimony attesting that Burkett never stated his exact whereabouts at the time of the murders; that Burkett's mother and brother never claimed to know either; and that counsel interviewed Burkett and the defense investigators interviewed numerous witnesses to determine the activities of Burkett and Perry, and the ongoing of the victims before and during the time of the murders.  2 SHCR-01, pp. 476-77 (State's Exhibit J); *id.* at 479-80 (State's Exhibit K).  Counsel cannot perform deficiently where they investigated the possibility of an alibi defense.

More importantly, Burkett presents no credible evidence that any such alibi exists, so he cannot prove he was prejudiced by counsel's omission.  As summarized in Part I.A, *supra*, Kathryn and Christopher Burkett provide false statements attesting that Jason was at work with Christopher on the day of the murders. 1 SHCR-01, pp. 79-83 (Burkett's Exhibits ##6-7).  Christopher Burkett

states that he was working for Grady Page, and that his brother Jason was with him the entire time. *Id.* at 83. However, Mr. Page denies that Jason Burkett was working on the specific day in question and, while Burkett had worked for Mr. Page previously, he had stopped about two or three weeks before. 2 SHCR-01, pp. 463 (State's Exhibit G). Mr. Page also stated that Burkett asked him to testify at trial that he was working at the time of the murders, but Mr. Page declined because "that's a lie." *Id.*

The state court found that affidavits from Kathryn and Christopher Burkett contain perjured statements, and that Burkett commits perjury by pleading the claim. 2 SHCR-01, pp. 553-54 (FF 14-16), p. 556 (FF 35). Given Mr. Page's statement that Burkett was not working for him on the day of the murders and the affidavits of trial counsel that neither Burkett or his family provided the alibi offered during postconviction proceedings, the Court must reject the claim for Burkett's failure to prove ineffective assistance.

### 2.    failure to interview Megan Lazrine before trial

Burkett states that "Megan asserts that she contacted counsel's office, but that counsel never returned her call." Memorandum, p. 44. He argues that had trial counsel interviewed her, "it is likely that she would have alerted counsel to the threats and coercive tactics that the State was using to compel her to testify falsely." *Id.* at 45. Burkett's allegation does not establish deficient performance

or resulting prejudice.

A habeas petitioner must allege facts that, if true, would entitle him to relief. *Theriot v. Whitley*, 18 F.3d 311, 315 (5th Cir. 1994). Here, Burkett relies on the falsified statement of Lazrine to support his claim—a statement which Megan Lazrine denied making and which she contends is untrue. 2 SHCR-01, p. 419 (State's Exhibit B). Counsel cannot perform deficiently for failing to obtain false evidence which Burkett created during postconviction proceedings.

Nevertheless, Megan Lazrine was actually interviewed by the defense, and the evidence she provided certainly did not help Burkett's case. Defense counsel Stephen Jackson states in his affidavit:

> I do not recall if I personally or my investigator interviewed Megan Lazerine. However, I do have typed notes taken from that interview. Megan Lazerine claims that she overheard both Perry and the Applicant state that they were on the front page of the newspaper, then she stated that she knew that Perry stated this but could not recall if Jason said this, and that Applicant stated that he shot someone. Applicant told Lazerine, I shot them and took off running." A couple days later, Applicant came up to her with a newspaper and said, "We made the front page." Further, she told us that Applicant gave her a shotgun shell and said to her that she could use the shell to remember them by."

2 SHCR-01, p. 477 (State's Exhibit J). Burkett fails to prove counsel performed deficiently when, in fact, either counsel or the investigator contacted the witness in question and interviewed her regarding the case. Since Burkett cannot establish both elements of a *Strickland* claim, the Court should deny relief.

-37-

### E.     Appellate counsel was not ineffective.

As his final claim, Burkett argues that his appellate counsel rendered ineffective assistance by failing to raise the Section 7.02(b) issues (discussed in Part II.B, *supra*) on direct appeal.  Petition, p. 8(B); Memorandum, pp. 45-57. Even if this claim was not defaulted, it is meritless and does not warrant relief.

A criminal defendant is constitutionally entitled to effective assistance of counsel on direct appeal.  *Evitts v. Lucey*, 469 U.S. 387 (1985).  To establish a claim of ineffective assistance, Burkett must demonstrate that appellate counsel's performance was deficient and that such deficiency prejudiced his defense.  *Strickland*, 466 U.S. at 687.  Appellate counsel has no constitutional obligation to raise every possibly meritorious challenge, even if requested. *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983) (no constitutional right to have appellate counsel raise every "colorable" claim that defendant requests).  Only "solid, meritorious arguments based on directly controlling precedent should be discovered and brought to the court's attention." *United States v. Williamson*, 183 F.3d 458, 462-63 (5th Cir. 1999).  Regarding prejudice, Burkett must show a reasonable probability that he would have prevailed on appeal had counsel raised the omitted claims.  *Smith v. Robbins*, 528 U.S. 259, 285-87 (2000).

During state habeas proceedings, Burkett's appellate counsel Jerald D. Crow provided affidavit testimony attesting that he considered including a

Section 7.02(b) issue in the direct appeal, but after researching the issue, found it to be meritless or a novel application and, thus, excluded it. 2 SHCR-02 at 499-501 (State's Exhibit M). The record reflects that defense counsel moved to bar the State from utilizing a conspiracy theory and, citing *Reed v. State*, 117 S.W.3d 260 (Tex. Crim. App. 2003), argued that the State intended to rely upon a *different culpable mental state* other than those alleged in the indictment. 3 CR 400-03. The motion was denied. 3 CR 403. According to Mr. Crow, he did not raise the issue on appeal because:

> After further research, I was of the opinion that the law of parties as set forth in § 7.02 of the penal code was not a culpable mental state and that the law of parties need not be pled in an indictment. *Montoya v. State*, 810 S.W.2d 160 (Tex.Crim.App. 1989), *cert. denied*, 502 U.S. 961 (1991). The *Montoya* decision had been reaffirmed in several cases prior to the Applicant's trial.

2 SHCR-02 at 499-501 (State's Exhibit M). Counsel does not render deficient performance for failing to raise meritless issues on appeal. *Evitts*, 469 U.S. at 394; *Jones,* 463 U.S. at 754.

Counsel also did not render constitutionally ineffective assistance by failing to raise a claim that the law-of-parties-by-conspiracy instruction lessened the State's burden of proof of the culpable mental state for capital murder. The legal basis for the claim has been rejected by several state appellate courts. *Cienfuegos v. State*, 113 S.W.3d 481 (Tex. App.--Houston [1st Dist.] 2003, pet. ref'd); *Gravis v. State*, 982 S.W.2d 933, 938 (Tex. App.--Austin 1998, pet. ref'd).

Furthermore, the evidence in this case shows beyond a reasonable doubt that Burkett and Michael Perry formed a conspiracy to commit robbery and murder in order to obtain the cars belonging to the victims. Murder was reasonably foreseeable and was one of the felonies that Burkett and Perry intended to commit if needed. The evidence clearly supported the submission of a charge on criminal responsibility pursuant to Section 7.02(b). *Montoya*, 810 S.W.2d at 165. Counsel did not render ineffective assistance for failing to raise this meritless issue on direct appeal.

## NO EVIDENTIARY HEARING IS WARRANTED

Burkett moves for an evidentiary hearing, for appointment of counsel, and for appointment of "experts in the field of entomology and anthropology" in order to pursue claims of actual innocence, prosecutorial misconduct, and ineffective assistance of counsel. Docket Entry No. 31, Motion for Evidentiary Hearing and Appointment of Counsel, pp. 8-9. The Court should deny the request.

Where a habeas petitioner has failed to fully develop the factual bases of his claims in state court, he is precluded from further factual development in federal court unless (1) his claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable through the exercise due diligence; *and* (2) he establishes by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty. 28

U.S.C. § 2254(e)(2).   Even if Burkett could meet the threshold showing of diligence, the Court should deny a hearing.   In determining whether an evidentiary hearing is warranted, the court "must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle [him] to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2006).   Thus, "[i]t follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id.*

Burkett requests an evidentiary hearing so that a certified document examiner can review the statements which the Texas court found were falsified. Motion, pp. 4-5.   He contends that "if these witnesses have truly recanted their original affidavits," then he is entitled to confront them in open court.   *Id.* at 6. In a supplemental motion received September 24, 2009, Burkett maintains that the recantations were obtained by the investigator Cash who is "an extremely interested party."   Motion to Supplement, p. 2.   Finally, Burkett argues that scientific evidence regarding decomposition exonerates him because it challenges the State's proposed time of death.   Docket Entry No. 31,Motion, p. 8.

Initially, the Court should deny Burkett's motion because all the claims are procedurally defaulted.   In any event, Burkett's claim of actual innocence is not cognizable on federal review.   His claims of innocence, prosecutorial

misconduct, and ineffective assistance are based on falsified evidence, and there is certainly no need for a certified document examiner where the witnesses refute ever having written the statements.  Finally, the ineffective assistance claims can be resolved on the existing record without the necessity of a hearing. *Clark v. Johnson*, 227 F.3d 273, 284-85 (5th Cir. 2000) (court has discretion to deny a hearing if sufficient facts exist to make an informed decision).

## CONCLUSION

The Director respectfully requests that the Court deny and dismiss Burkett's petition for writ of habeas corpus and deny his request for an evidentiary hearing.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

ANDREW WEBER
First Assistant Attorney General

ERIC J. R. NICHOLS
Deputy Attorney General for Criminal Justice

EDWARD L. MARSHALL
Chief, Postconviction Litigation Division

s/ Katherine D. Hayes*
Assistant Attorney General
Postconviction Litigation Division
Texas Bar No. 00796729
Southern District No. 22698

* Attorney-in-charge

-42-

Office of the Attorney General of Texas
P. O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone:  (512) 936-1400
Telecopier: (512) 320-8132
Email: katherine.hayes@oag.state.tx.us

ATTORNEYS FOR RESPONDENT


## CERTIFICATE OF SERVICE

I do hereby certify that on October 2, 2009, I filed the foregoing pleading

using the ECF system of the Court, and then I served Petitioner by mailing a

copy to:  Jason Aaron Burkett, TDCJ-ID# 1201349, c/o Estelle Unit, 264 FM

3478, Huntsville, TX 77320

s/ Katherine D. Hayes
Assistant Attorney General