IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JASON AARON BURKETT, | § | |
| TDCJ #1201349, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-08-0266 |
| | § | |
| RICK THALER, Director, | § | |
| Texas Department of Criminal Justice - | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent.[1] | § | |

## MEMORANDUM AND ORDER

The petitioner, Jason Aaron Burkett (TDCJ #1201349), is incarcerated in the Texas Department of Criminal Justice - Correctional Institutions Division ("TDCJ"). Burkett seeks a writ of habeas corpus to challenge his state-court conviction under 28 U.S.C. § 2254. The respondent has filed an answer, arguing that Burkett is not entitled to relief. (Docket Entry No. 32). Burkett has filed a reply and a motion for stay and abatement. (Docket Entry No. 35, 37).

After considering all of the pleadings, the state-court records, and the applicable law, this court denies Burkett's petition and dismisses this case. Final judgment is entered by separate order. The reasons for this ruling are set forth below.

---

[1]  The former respondent, Nathaniel Quarterman, has retired from his position as Director of the Texas Department of Criminal Justice - Correctional Institutions Division. The Court substitutes his replacement, Rick Thaler, as the proper respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

## I.      Background

After a jury trial in the 221st District Court of Montgomery County, Texas, Burkett was convicted of capital murder and sentenced to life imprisonment.  In this federal habeas corpus petition, Burkett alleges that he is actually innocent because two of the state's witnesses gave false testimony at his trial.  Burkett also argues that his trial was tainted by prosecutorial misconduct and other constitutional violations.  The respondent emphasizes in seeking dismissal that Burkett's allegation of actual innocence was refuted and his other claims were rejected on state habeas corpus review.  The state habeas court found that Burkett had perpetrated an "abuse of the writ" by submitting fabricated evidence.  The relevant state court proceedings are summarized below, beginning with the evidence presented at Burkett's trial.

### A.      Burkett's Trial

Burkett and his codefendant, Michael James Perry, were charged with the capital murder of three people on October 24, 2001, while carrying out a plan to steal two vehicles.  The vehicles belonged to one of the victims, Sandra Stotler.[2]  The other victims were her son, James Adam Stotler, and his friend, Arnold Jeremy Richardson.  The indictment in Cause Number 03-07-05136-CR charged that Burkett and Perry committed capital murder on October 24, 2001 by causing: (A) the death of James Adam Stotler in the course of robbing James Adam Stotler; (B) the deaths of Arnold Jeremy Richardson and James Adam Stotler during the same criminal transaction; or (C) the deaths of Sandra Stotler, James Adam Stotler, and Arnold Jeremy Richardson "during the same scheme and course of conduct."

---

[2] *See* Clerk's Record ("CR"), vol. 3, at 328-29.

Burkett and Perry were tried separately.  At Burkett's trial, the State elected to proceed under the third allegation (paragraph C).[3]  The State argued that, with Burkett's help, Perry shot and killed Sandra Stotler in her home at approximately 7:00 p.m. on Wednesday, October 24, 2001.  After disposing of the body in a nearby lake, Burkett and Perry lured Sandra Stotler's 16-year-old son, James Adam Stotler ("Adam"), and his friend, Arnold Jeremy Richardson ("Jeremy"), to a wooded area.  Burkett shot and killed both boys in that location.  Burkett took the white Izusu Rodeo vehicle that Adam was driving, while Perry returned to Sandra Stotler's home and took her red Chevrolet Camaro.

The State presented evidence showing that in October 2001, Burkett and Perry were living in "a fifth wheel travel trailer, somewhat mistreated," on the outskirts of Conroe, Montgomery County, Texas.[4]  Victor Neal, who lived with Burkett and Perry at the time, testified that none of them had their own vehicles.[5]  Neal testified that Burkett often borrowed a small blue Chevy pick-up truck belonging to his girlfriend, Kristin Willis.[6]  The arrangement frustrated Burkett, who disliked being stranded at the trailer whenever Willis did not show up.[7]  Neal testified that, after one such instance in mid-October 2001, Burkett and Perry made plans to steal a vehicle.[8]

---

[3]  *See* Court Reporter's Record ("CRR"), vol. 17, at 23-24.

[4]  CRR, vol. 17, at 124 (testimony of Detective Carey Mace).

[5]  *See id.*, vol. 17, at 239.

[6]  *See id.*, vol. 17, at 202.

[7]  *See id.*, vol. 17, at 240.

[8]  *See id.*, vol. 17, at 240-41. Willis testified that she also overheard Burkett and Perry make such a plan. CRR, vol. 18, at 44.

Neal testified that he accompanied Burkett and Perry in Willis's truck one day in October as they trolled through various parking lots in The Woodlands and Conroe looking for "nice[,] good looking" cars to steal.[9]  Burkett and Perry were armed with a loaded pump-action shotgun.[10]  Neal, who was the only one old enough to buy ammunition, admitted that he had purchased some "green shells" at Burkett's request.[11]  Neal testified that Burkett soon became "angry and frustrated" because the parking lots were crowded with too many witnesses.[12]  Neal heard Burkett and Perry plan to take a car, kill the driver, and dispose of the body in nearby Crater Lake, where they believed it would sink and never be found.[13]

Neal testified that, on the morning of Wednesday, October 24, 2001, he was awakened by either Burkett or Perry – "one of them" – who said that he was going to take Kristin Willis to work.[14]  Willis testified that at around 10:00 a.m. that day, Burkett and Perry dropped her off at the local sportswear store where she worked and left in her truck.[15]  Willis also gave Burkett her cellphone

---

[9]  CRR, vol. 17, at 241-44.

[10]  *See id.*, vol. 17, at 203-06, 242-43, 246.

[11]  *See id.*, vol. 17, at 238-39.

[12]  *See id.*, vol. 17, at 244-51.

[13]  *See id.*, vol. 17, at 244-46, 250-52.

[14]  *See id.*, vol. 17, at 254.

[15]  CRR, vol. 18, at 47.  Kristin Willis was deemed an accomplice and given immunity from prosecution in exchange for her testimony.  *See id.*, vol. 18, at 37-38.

because he did not have a phone of his own.[16]   Burkett and Perry returned to the store later that afternoon, at around 3:30 or 4:00 p.m., and brought Willis some lunch.[17]

At some time between 7:30 and 8:00 p.m. that same day, October 24, a neighbor saw a truck matching the description of the one owned by Kristin Willis idling in front of Sandra Stotler's home in the gated community of Highland Park, near Conroe.[18]   Witnesses testified that Sandra Stotler, a widow, lived in the home with her teenage son, Adam.[19]   Adam's friend Jeremy was staying with them because of problems between his parents, who were going through a divorce.[20]   Sandra Stotler kept a red convertible Chevrolet Camaro in her garage, but she drove a white Isuzu Rodeo to work. Stotler was a nurse's aid at the Conroe Regional Hospital.[21]   On the night of October 24, 2001, however, Adam and Jeremy had driven the Isuzu Rodeo to a local skateboarding park after visiting a friend.[22]

Kristin Willis testified that Burkett and Perry picked her up around 8:30 p.m. on October 24, after she finished work.[23]   Burkett used Willis's cellphone to call her workplace shortly before that

---

[16]  *See id.*, vol. 18, at 48, 52.

[17]  *See id.*, vol. 18, at 51; vol. 18, at 185-93 (testimony of Willis's coworker, Terry Bucy).

[18]  CRR, vol. 18, at 16-27 (testimony of Vance Frerichs).

[19]  CRR, vol. 17, at 304-20 (testimony of Stotler's coworker Arlene Gibson);  CRR, vol. 19, at 242-56 (testimony of Stotler's mother, Mary Ann Bockwich).

[20]  CRR, vol. 17, at 321-25 (testimony of Adam's friend, Eric Paul Olden).

[21]  CRR, vol. 17, at 304-20 (testimony of Stotler's coworker Arlene Gibson);  CRR, vol. 19, at 242-56 (testimony of Stotler's mother, Mary Ann Bockwich).

[22]  CRR, vol. 17, at 324-25 (testimony of Adam's friend, Eric Paul Olden).

[23]  CRR, vol. 18, at 54.

time.[24]  Willis accompanied Burkett and Perry to a gated subdivision in Conroe, where they waited

until two boys arrived driving an Isuzu Rodeo.[25]  Willis noticed a shotgun in the truck.[26]  Willis

testified that the boys followed in the Isuzu Rodeo as Burkett drove her truck to a dirt road that led

into a wooded area.[27]  Burkett and Perry got out of the truck and all four boys walked into the

woods.[28]  By then, it was dark.[29]  Burkett had the shotgun with him when he left the truck.[30]

Willis stayed in the truck, listening to the radio.[31]  Willis testified that, at one point, Perry

returned with "one of the boys."[32]  Perry and the other boy got into the Isuzu Rodeo and drove

further into the wooded area, leaving Willis waiting in the truck.[33]  Willis rolled down the window

to smoke a cigarette and heard a shot.[34]  Burkett and Perry returned in the Isuzu Rodeo without the

two boys.[35]  When Willis asked them what had happened, Burkett replied, "[you don't] want to

---

[24] *See id.*, vol. 18, at 105.

[25] *See id.*, vol. 18, at 56-57.

[26] *See id.*, vol. 18, at 58-59.

[27] *See id.*

[28] *See id.*, vol. 18, at 60.

[29] *See id.*

[30] *See id.*, vol. 18, at 61.

[31] *See id.*

[32] *See id.* at 61-62.

[33] *See id.*

[34] *See id.* at 63.

[35] *See id.* at 62-63.

know."[36]  Willis drove herself home in her truck, while Burkett and Perry left driving the Isuzu Rodeo.[37]

Consistent with Willis's account, a nearby resident testified that he saw a truck similar to the one owned by Willis parked on the road leading to a wooded area near his home.[38]  This witness saw a white Isuzu Rodeo meet the truck,[39] then heard two doors open and shut on the Rodeo before both vehicles drove away.[40]

Another nearby resident testified that she heard shots fired in the wooded area near her home at around 9:30 p.m. on October 24.[41]  This witness testified that she heard a series of shotgun blasts, a pause, then several more shotgun blasts.[42]

Another witness, Amanda Eppes, testified that sometime after 10:00 p.m. on October 24, Burkett and Perry arrived at a local "beer bar" known as the Nite Life.[43]  Perry was driving a red Camaro and Burkett was driving a white Isuzu Rodeo.[44]  Burkett told Eppes that he had just won $7,000 with a "scratch-off lottery ticket" and that he and Perry had used the money to buy the

---

[36]  *See id.*

[37]  *See id.*

[38]  *See id.*, vol. 18, at 194-201 (testimony of Linne Berry).

[39]  *See id.*

[40]  *See id.*

[41]  *See id.*, vol. 18, at 203-04 (testimony of Sharon Nieser).

[42]  *See id.*

[43]  *See id.*, vol. 18, at 214.

[44]  *See id.*, vol. 18, at 222, 225.

vehicles.[45] Neal, Burkett's and Perry's roommate, testified that Burkett told him the same story.[46] Eppes thought that there was something unusual about Burkett's story because the Isuzu Rodeo contained personal belongings, including two skateboards and some CDs.[47] The vehicles did not look like they had been recently purchased from a car sales lot.[48] Neal testified that later that night, Burkett admitted that he and Perry had stolen the vehicles.[49]

The following day, Thursday, October 25, Burkett and Perry visited a local tattoo parlor owned by Shane Atkinson.[50] Atkinson testified that Perry was driving a red Camaro and Burkett was driving a white Isuzu Rodeo.[51] Atkinson testified that the day before, Burkett and Perry had come to the tattoo parlor in Kristin Willis's truck and unsuccessfully tried to sell him two shotguns and a Glock pistol.[52] Atkinson asked Burkett about the new vehicles. Burkett said he had bought the Rodeo and the Camaro with $7,000 from a scratch-off lottery ticket.[53] Atkinson expressed

---

[45] CRR, vol. 17, at 254-55.

[46] CRR, vol. 18, at 223.

[47] *See id.*, vol. 18, at 236.

[48] CRR, vol. 18, at 226. Burkett told the same lottery-ticket story to others, including Mary Beth Lewandowski, who testified that she also doubted his account of how he came to possess the Rodeo. CRR, vol. 19, at 304-05.

[49] CRR, vol. 17, at 257.

[50] CRR, vol. 18, at 236, 346.

[51] *See id.*, vol. 18, at 246.

[52] *See id.*, vol. 18, at 243.

[53] *See id.*, vol. 18, at 246.

skepticism.  Perry blurted out that "they had killed some people and stole the cars."[54]  Atkinson testified that he took Burkett aside and asked what really happened.[55]  Burkett responded that what Perry had said was true and admitted that he and Perry had killed three people and stolen their vehicles.[56]

Atkinson recounted the details of Burkett's admission for the jury.  Around 7:00 p.m. on Wednesday, October 24, 2001, Burkett had knocked on the front door of a "nice house" that belonged to "a friend" and asked the woman who answered if he could use the phone.[57]  Burkett told the woman that his car had broken down.[58]  Perry entered the home through the back door and shot the woman with a rifle.[59]  Burkett and Perry then "looked for some keys to some cars" that the woman owned.[60]  When they were unable to find the keys, Burkett and Perry waited around for "some boys" to return to the home, referring to the woman's son (Adam Stotler), who was out with his friend (Jeremy Richardson).[61]  Burkett and Perry had contacted the boys by phone and made up a story about a "mutual friend" who needed help after being hurt in the woods.[62]  After luring the

---

[54] *See id.*, vol. 18, at 247.

[55] *See id.*, vol. 18, at 247-48.

[56] *See id.*

[57] *See id.*, vol. 18, at 248.

[58] *See id.*, vol. 18, at 249-50.

[59] *See id.*

[60] *See id.*, vol. 18, at 249, 250.

[61] *See id.*, vol. 18, at 251.

[62] *See id.*

boys into the woods, Burkett shot Adam.[63]  Burkett told Atkinson that he killed Adam because Perry could not, explaining that Perry and the son "[were] way too good of friends[.]"[64]  Burkett shot the other boy, Jeremy, because he was a witness.[65]

Atkinson testified that he was "shaken" by Burkett's confession.[66]  Atkinson summoned a friend, Kevin Lyle, to give him a ride to Huntsville, where Atkinson lived with his wife and children.[67]  Lyle testified that Atkinson was very agitated.[68]  When he arrived home, Atkinson contacted "Crime Stoppers" and reported what he had learned.[69]  Atkinson left a message that day, but did not speak with the police until later.[70]

On Friday, October 26, 2001, Perry wrecked the Camaro following a brief chase by Montgomery County police.[71]  Perry was charged with evading arrest.[72]  Perry presented Adam Stotler's Texas driver's license and was booked into the Montgomery County Jail as Adam Stotler.

---

[63]  *See id.*, vol. 18, at 251-52.

[64]  *See id.*

[65]  *See id.*, vol. 18, at 251.

[66]  CRR, vol. 18, at 252.

[67]  *See id.*, vol. 18, at 236, 253.

[68]  CRR, vol. 19, at 76.

[69]  *See id.*, vol. 18, at 80.

[70]  CRR, vol. 18, at 254-55.

[71]  CRR, vol. 17, at 82 (testimony of Detective Carey Mace).

[72]  CRR, vol. 19, at 99 (testimony of Sergeant Robert Albritton).

Perry was released on bond before officials could discover his true identity.[73]  Neal testified that

after Perry got out of jail, he and Burkett returned to the trailer and began packing their clothes.[74]

Neal testified that they were planning to "[get] out of town because it was getting too hot."[75]

On Saturday, October 27, 2001, a fisherman reported finding a dead body in Crater Lake.[76]

Deputies with the Montgomery County Sheriff's Department recovered the body of a white female,

wrapped in bedding and blankets.[77]  She had no identification and an "extremely large" wound that

looked like a gunshot from a large caliber weapon or shotgun.[78]  The autopsy revealed that she had

been shot twice in the same part of her body, at close range.[79]  Because of decomposition, it took

several more days to identify the body as Sandra Stotler.[80]

Before the body was identified, Montgomery County police officers visited Sandra Stotler's

home at around 7:00 p.m. on Saturday, October 27, to conduct a "welfare check."[81]  A coworker had

reported Stotler missing after she did not show up for her shift at the hospital.[82]  Officers heard a

---

[73]  *See id.*, vol. 19, at 103.

[74]  CRR, vol. 17, at 263.

[75]  *Id.*, vol. 17, at 264.

[76]  CRR, vol. 18, at 210-11 (testimony of Randy Pond).

[77]  *See id.*, vol. 19, at 121 (testimony of Deputy Mary Kathryn Haver); vol. 19, at 156 (testimony of Damon Hall).

[78]  *Id.*, vol. 19, at 168, 169 (testimony of Damon Hall).

[79]  CRR, vol. 17, at 56-57 (testimony of Detective Mace); vol. 22, at 81-82 (testimony of Dr. Paul Shrode).

[80]  CRR, vol. 17, at 66 (testimony of Detective Mace).

[81]  *See id.*, vol. 19, at 345-46 (testimony of Deputy Mandy Pieper).

[82]  *See id.*, vol. 19, at 346; vol. 17, at 311-12 (testimony of Sandra's coworker, Arlene Gibson).

television and saw lights on, but received no response at the door.[83]  The front door was unlocked.
The officers entered, saw blood in the "rear foyer" of the home,[84] and found a shotgun shell.[85]  They
also observed what looked like a trail of dried blood leading into the garage.[86]  The garage door was
open and there was no vehicle inside.[87]  No one else was in the house.  There was no sign of her son,
Adam.  The house was secured as a crime scene.[88]

During his investigation, Montgomery County Detective Carey Mace learned that Sandra
Stotler owned two vehicles, a red Chevrolet Camaro and a white Isuzu Rodeo.[89]  Mace also learned
that the red Camaro had been impounded by police and that an individual identified as Adam Stotler
had been arrested after he "wrecked out" that vehicle during a police chase on Friday, October 26,
2001.[90]  In an effort to locate Sandra Stotler's other vehicle, the white Isuzu Rodeo, Mace reported
the car as stolen.[91]  Detective Mace also tried to locate Adam Stotler and his friend, Jeremy
Richardson, both of whom were missing.[92]  Eventually, after conducting a "two-finger lookup,"

---

[83]  CRR, vol. 19, at 348 (testimony of Deputy Mandy Pieper).

[84]  *See id.*, vol. 19, at 350.

[85]  *See id.*, vol. 19, at 352.

[86]  *See id.*, vol. 19, at 353.

[87]  *See id.*, vol. 19, at 358.

[88]  *See id.*, vol. 19, at 353.

[89]  CRR, vol. 17, at 82-84.

[90]  *See id.*, vol. 17, at 82.

[91]  *See id.*, vol. 17, at 84.

[92]  *See id.*, vol. 17, at 84, 92.

officers learned that the young man who had wrecked Sandra Stotler's red Camaro was Michael Perry, who had a felony warrant out for his arrest.[93]

On Monday, October 29, 2001, the *Conroe Courier* ran a front page article about the unidentified body of a woman found in Crater Lake.[94]  According to different witnesses, Burkett and Perry spent that day hanging out with some acquaintances, including Megan Lazrine, Jennifer Buehler, Aaron Davidson, and Ian McCoin.  Burkett was driving the white Isuzu Rodeo.[95]  Megan Lazrine testified that when she saw Burkett that day, he told her that he "shot someone" and asked her not to tell.[96]  Lazrine testified that Burkett pointed to the *Courier* article and boasted:  "Look, we made the front page."[97]  Ian McCoin testified that he saw a shotgun in the Rodeo and that he overheard Burkett make a similar remark.  McCoin also saw Burkett burn a copy of the *Courier*, saying that "they needed to get rid of the evidence."[98]

Aaron Davidson testified that he left with the group that included Burkett and Perry on the night of Monday, October 29, because he had nowhere else to go.[99]  Burkett was driving the Rodeo. Burkett remarked that if stopped by police, "they would have to shoot him or he would shoot

---

[93]  *See id.*, vol. 17, at 83-84.

[94]  CRR, vol. 19, at 278 (testimony of Megan Lazrine); 311 (testimony of Jennifer Buehler); 336 (testimony of Ian McCoin).

[95]  *See id.*, vol. 19, at 261, 272-73, 321-22.

[96]  *See id.* vol. 19, at 268-69.

[97]  *See id.*, vol. 19, at 278.

[98]  *See id.*, vol. 19, at 336, 339, 341.

[99]  *See id.*, vol. 19, at 132, 137.

them."[100]  Davidson saw a shotgun in the front-passenger area of the Rodeo.[101]  Burkett parked the Rodeo behind a Mobil Sunmart gas station/truck stop on the I-45 Interstate Freeway south of The Woodlands.  All three men fell asleep.[102]

At approximately 5:30 a.m., on Tuesday, October 30, Montgomery Sheriff's Deputy Howard Lee Smith, III found the Rodeo parked at the back of the Mobil Sunmart.[103]  Deputy Smith "advised dispatch over the radio" because he knew that units in the area were searching for the Rodeo.[104] Activating his "take down lights," Deputy Smith aimed a spotlight into the passenger compartment and instructed the occupants to show their hands.[105]  Davidson, who was in the back seat, testified that Burkett and Perry debated what to do.[106]  Burkett started the Rodeo and backed away from the patrol car.[107]  As Deputy Smith pointed a shotgun at him, Burkett accelerated forward, striking Deputy Smith.[108]  Still armed with his weapon, Deputy Smith shot out the rear tire of the Rodeo as

---

[100] *See id.*, vol. 19, at 138.

[101] *See id.*, vol. 19, at 139.

[102] *See id.*, vol. 19, at 141.

[103] CRR, vol. 22, at 144, 147-51.

[104] *See id.*, vol. 22,  at 151.

[105] *See id.*, vol. 22, at 152.

[106] *See id.*, vol. 19, at 145.

[107] CRR, vol. 22, at 157.

[108] *See id.*, vol. 22, at 158.

it drove away.[109]  Davidson jumped from the Rodeo with his hands up and he was taken into custody.[110]

Deputy Phillip Viands testified that, just as he arrived to assist Deputy Smith, he saw the Rodeo turn quickly in front of the Mobil Sunmart.[111]  Deputy Viands saw the vehicle strike a retaining wall before crashing into a nearby store.[112]  As Deputy Viands aimed his spotlight at the Rodeo, he saw a shotgun come out of the driver's side window and point in his direction.[113]  Fearing for his safety, Deputy Viands responded by firing his weapon.[114]  Still holding the shotgun, Burkett exited the Rodeo and fled into the building along with Perry.[115]  Deputy Viands identified Burkett as the driver who was armed with the shotgun.[116]

Burkett and Perry escaped to the nearby Wildwood Forest Apartments.[117] They found Megan Lazrine, who lived there with her parents.[118]  Burkett, who was injured, admitted to Lazrine that he

---

[109]  *See id.*, vol. 22, at 159.

[110]  *See id.*, vol. 19, at 148.

[111]  CRR, vol. 22, at 165.

[112]  *See id.*, vol. 22, at 165-66.

[113]  *See id.*, vol. 22, at 167-68.

[114]  *See id.*, vol. 22, at 169.

[115]  *See id.*, vol. 22, at 170-71.

[116]  *See id.*, vol. 22, at 171.

[117]  CRR, vol. 22, at 147 (testimony of Deputy Smith, describing the location of the Mobil Sunmart as adjacent to the Wildwood Forest Apartments).

[118]  CRR, vol. 19, at 283-84 (testimony of Megan Lazrine, explaining that the Mobil gas station was located behind her apartment).

had been involved in a shoot-out with police.[119]   Burkett and Perry were apprehended at the apartment a short time later.[120]

After Burkett and Perry were taken into custody, police learned the location of Adam Stotler's and Jeremy Richardson's bodies.[121]   They were recovered near each other in a wooded area later that day, October 30.  Both had multiple shotgun wounds.[122]

In addition to this testimony, the State presented forensic evidence that linked Burkett and Perry to the murders of Sandra Stotler, Adam Stotler, and Jeremy Richardson.[123]   DNA from a cigarette found underneath Adam's body matched Perry's DNA.[124]   Shotgun shell casings retrieved from the Stotler home and the woods where the boys' bodies were found matched the shotgun recovered during Burkett's arrest.[125]   The shotgun had blood on it.[126]   DNA testing showed that the blood was Burkett's.[127]

---

[119]   *See id*., vol. 19, at 284.

[120]   CRR, vol. 20, at 105-107 (testimony of Agent Sidney Blair).

[121]   CRR, vol. 17, at 102-05 (testimony of Detective Mace).

[122]   *See id*., vol. 17, at 105-06, 113-15.

[123]   The State presented testimony from numerous witnesses, including Buster Emmons, Damon Hall, William Bodziak, Matthew Clements, about blood, finger prints, firearms, shotgun shells, shoe or sock impressions, and other evidence the police recovered from the crime scenes.  The State also presented testimony from Dr. Paul Shrode, of the Harris County Medical Examiner's Office, about the autopsies that were performed on the victims.  In addition, the State presented testimony from Robin Freeman, of the Texas Department of Public Safety's DNA Section.

[124]   CRR, vol. 19, at 201 (testimony of Damon Hall).

[125]   CRR, vol. 24, at 10-14, 26 (testimony of Matthew Clements).

[126]   CRR, vol. 23, at 44 (testimony of Damon Hall).

[127]   *See id*., vol. 23, at 232-33 (testimony of Robin Freeman).

After hearing the evidence, the jury found Burkett guilty as charged in the indictment.[128] The

State sought the death penalty.  Following a separate punishment proceeding, the jury was unable

to reach a verdict on all three special issues required to impose a death sentence under Texas law.[129]

The trial court sentenced Burkett to life imprisonment.

### B.      Burkett's Direct Appeal

On direct appeal, Burkett argued that the trial court erred by denying his motion to quash the

indictment.  Burkett argued that he committed a "mass murder," rather than a series of murders as

alleged in the indictment.  Burkett argued further that the evidence was insufficient to support his

conviction because the offense charged was not the offense proven, resulting in a what he

characterized as a fatal variance between the pleading and the proof.  The Texas Court of Appeals

found that Burkett had failed to preserve the claim of error in his challenge to the indictment and

rejected his remaining arguments.  *Burkett v. State*, 172 S.W.3d 250 (Tex. App. — Beaumont 2005).

The Texas Court of Criminal Appeals refused Burkett's petition for discretionary review.  The

---

[128]  In a separate trial, Perry was convicted of murdering Sandra Stotler in the course of committing burglary and sentenced to death.  His conviction was upheld on direct appeal.  *See Perry v. State*, 158 S.W.3d 438, 439 (Tex. Crim. App. 2004), *cert. denied*, 546 U.S. 933 (2005).  The Texas Court of Criminal Appeals denied Perry's application for a state writ of habeas corpus under Article 11.07 of the Texas Code of Criminal Procedure.  *See Ex parte Perry*, No. 62,906-01, 2006 WL 833169 (Tex. Crim. App. March 29, 2006).  The federal courts also denied Perry's petition for a writ of habeas corpus under 28 U.S.C. § 2254.  *See Perry v. Quarterman*, 314 F. App'x 663, 2009 WL 613172 (5th Cir. March 11, 2009), *cert. denied*, — U.S. —, 130 S. Ct. 574 (2009).  He was executed on July 1, 2010.

[129]  In Texas, jurors must answer three "special issues" in favor of the death penalty for the court to impose capital punishment: (1) whether the defendant would "commit criminal acts of violence that would constitute a continuing threat to society"; (2) whether the defendant actually caused or intended to cause the death of the victim; and (3) whether mitigating evidence warranted "the imposition of life imprisonment rather than a death sentence."  TEX. CODE CRIM. PROC. art. 37.071(b).  The record shows that the jury was unable to decide the third special issue regarding the existence of mitigating evidence.  CR, vol. 3, 472-73, 477-80.

United States Supreme Court denied his petition for a *writ of certiorari.  See Burkett v. Texas*, 548 U.S. 911 (2006).

### C.      Burkett's State Habeas Corpus Proceeding

Burkett filed a state habeas corpus application under Article 11.07 of the Texas Code of Criminal Procedure.  In that application, Burkett argued that he was entitled to relief for the following reasons: (1) he was actually innocent of the charged offense; (2) the prosecutor engaged in misconduct by coercing two witnesses (Kristin Willis and Megan Lazrine) to lie, by sponsoring perjured testimony, and by manufacturing evidence; (3) the trial court's jury instruction on the Texas law of parties was unconstitutional as applied to him; (4) he was denied effective assistance of counsel because his trial attorney failed to call his mother and his brother as alibi witnesses or to interview one of the State's witnesses (Megan Lazrine); and (5) he was denied effective assistance of counsel on appeal.

In support of his primary claim of actual innocence, Burkett submitted documents purporting to be affidavits from Kristin Willis and Megan Lazrine.  In her purported affidavit, Willis stated that "all of the past testimony that [she] gave [is] 100 percent false."[130]  Willis stated that she had accompanied Michael Perry that night and that Burkett "did not have anything to do with" the murders.[131]  In her purported affidavit, Megan Lazrine stated that she knew "absolutely nothing" about Burkett's "involvement in any murders."[132]  Lazrine explained that she had lied at Burkett's trial because the lead prosecutor, Assistant District Attorney Robert Bartlett, threatened to beat and

---

[130]  *Ex parte Burkett*, No. 68,232-01 at 54.

[131]  *See id*. at 54-56, 57.

[132]  *Id.* at 59.

rape her if she did not cooperate.[133]   Burkett offered another purported affidavit showing the signature of Cathy Lazrine, Megan's mother.  That affidavit stated that Megan had been pressured by police and threatened by one of the trial prosecutors, Robert Bartlett, to lie at Burkett's trial.[134] The affidavits from Kristin Willis, Megan Lazrine, and Cathy Lazrine were not notarized.

Burkett also submitted a declaration that was purportedly signed by his codefendant, Michael Perry.  In that document, Perry took sole responsibility for all three murders.  Perry stated that he had killed Sandra Stotler and that Kristin Willis helped him dump her body in Crater Lake.[135]  Perry stated that he killed Adam Stotler and Jeremy Richardson before taking the Isuzu Rodeo.[136]  With Willis's help, Perry then returned to the Stotler home and took the Camaro.[137]  Burkett argued that the declaration from Perry and the affidavits from Kristin Willis and Megan Lazrine showed that he had no involvement in the murders and exonerated him.

In a further effort to establish an alibi for the day of the murders, Burkett presented affidavits from his mother, Kathryn Burkett, and his brother, Christopher Burkett.  In her affidavit, Kathryn Burkett stated that Perry dropped her son off at her home between 1:00 and 1:30 p.m. on October 24, 2001, when the murders occurred, so that she could do his laundry.[138]  Shortly thereafter, Jason

---

[133] *Id.* at 59-65.

[134] *See id.* at 68.

[135] *See id.* at 70.

[136] *See id.* at 71.

[137] *See id.*

[138] *See id.* at 80.

Burkett left to go to work with her other son, Christopher.[139]  They did not return home until 7:30 p.m.[140]  In his affidavit, Christopher Burkett stated that he and his brother, Jason, worked all day for a man named Grady Page on October 24, 2001.[141]  Christopher dropped Jason Burkett off at his trailer at around 8:00 p.m.[142]  Burkett asserted in his state habeas filings that this evidence established an alibi for the time that the murders occurred and that his attorneys were deficient for failing to present this testimony at his trial.

In the state habeas court, Burkett also filed a motion for a protective order to prevent the prosecution from contacting any of the witnesses.[143]  The trial court denied the motion.[144]  An investigator for the Montgomery County District Attorney's Office met with Kristin Willis, Megan Lazrine, and Cathy Lazrine.  Each one insisted that she did not provide any statement or affidavit to Burkett.[145]  Each witness supplied a sworn statement denying the affidavits Burkett presented in support of his state habeas application.[146]

The prosecution also provided an affidavit from Michael Perry, who was represented by counsel and in the process of pursuing a direct appeal from his death sentence.  Perry maintained

---

[139] *See id.*

[140] *See id.*

[141] *See id.* at 83.

[142] *See id.* at 83.

[143] *See id.* at 238-42.

[144] *See id.* at 243.

[145] *See id.* at 550-51 (affidavit of Investigator Heather Cash).

[146] *See id.* at 410 (declaration of Kristin Willis); 419 (declaration of Megan Lazrine); 421 (declaration of Cathy Lazrine).

that the declaration provided by Burkett was an untrue "forged statement."[147]   Perry added that

Burkett had contacted him by letter and asked for help getting out of prison by confessing to all three

murders, stating that Perry would be put to death "in just a few more years" anyway.[148]  Perry stated

that he "unequivocally refused" Burkett's request and insisted that the declaration provided by

Burkett was wholly false.[149]

The State also presented evidence that refuted the affidavits from Burkett's family members.

The State provided an affidavit from Grady Page, who stated that Burkett had worked for him in the

past but did not work for him on the day of the offense.[150]   The State argued that all the affidavits

Burkett presented were false.

The State presented additional affidavits that refuted Burkett's substantive claims.  Burkett's

trial attorneys, Frank Blazek and Stephen D. Jackson, as well as his appellate counsel, Jerald D.

Crow, provided affidavits in response to Burkett's allegations of ineffective assistance.[151]  Both trial

attorneys stated that Burkett had not revealed any alibi and that his family members had never

claimed "to know of [Burkett's] whereabouts at the time of the murders."[152]  The prosecutors, Robert

---

[147]  *Id.* at 432.

[148]  *Id.* at 432, 440-42.

[149]  *Id.* at 432, 434.

[150]  *See id*. at 453.

[151]  *See id*. at 283-89, 313-14, 320-21, 322-23.

[152]  *Id*. at 313, 322.

Bartlett and Michael Griffin, also presented affidavits in response to Burkett's allegations of prosecutorial misconduct. They denied any coercion or inappropriate tactics.[153]

The state habeas corpus court, which had presided over the trials of both Burkett and Perry, found that the purported affidavits from Willis, the Lazrines, and Perry were "false."[154] The trial court found that Burkett had "suborned perjury" in filing affidavits from his mother and his brother.[155] The trial court noted that it was familiar with the performance of the trial prosecutors as well as Burkett's attorneys and found that the affidavits provided by these individuals were "credible."[156] The trial court concluded that, by presenting "false" evidence, Burkett had "abused the writ of habeas corpus" and that his action qualified as a "frivolous lawsuit" under Texas law.[157] The trial court alternatively rejected Burkett's substantive claims.[158]

In a strongly worded written opinion, the Texas Court of Criminal Appeals agreed with the trial court that, "by submitting false evidence," Burkett had "abused the Great Writ" of habeas corpus.[159] The Texas Court of Criminal Appeals held that Burkett "waived and abandoned any contention that he might have in regard to the instant conviction, at least insofar as existing claims

---

[153] *See id*. at 423-26, 428-29.

[154] *Ex parte Burkett*, No. 68,232-01 at 553, 554.

[155] *Id.* at 554.

[156] *Id.* at 554, 555.

[157] *Id.* at 556-57.

[158] *See id*.

[159] *Ex parte Burkett*, 2007 WL 4126375 (Tex. Crim. App. Nov. 21, 2007).

that he could have or should have brought in this application."[160]  In the alternative, the Texas Court of Criminal Appeals found that, based on Burkett's "submission of false evidence," his habeas action was "frivolous" and subject to dismissal for this additional reason.[161]  Because of Burkett's abusive conduct, the Texas Court of Criminal Appeals barred him from seeking further relief and directed the clerk of court "not to accept or file the instant application for a writ of habeas corpus, or any future application attacking this conviction unless [Burkett] shows in such an application that any claims presented have not been raised previously and that they could not have been presented in a previous application for a writ of habeas corpus."[162]

Burkett filed a second state habeas application on August 18, 2008, presenting an additional claim of actual innocence.  In that application, Burkett claimed to have new evidence to challenge testimony given by a forensic pathologist about the victims' time of death.  The Texas Court of Criminal Appeals denied this application on September 10, 2008, as barred by its prior order finding that Burkett had waived review of his claims by abusing the writ.[163]

### D.    The Claims on Federal Habeas Corpus Review

Burkett now seeks a writ of habeas corpus in federal court under 28 U.S.C. § 2254.  Burkett has filed two supplements to his original petition.  (Docket Entry Nos. 1, 8, 16).  Burkett raises the same claims that were rejected on state habeas corpus review.  The respondent maintains that Burkett's petition is barred by procedural default because all his claims were clearly rejected for

---

[160]  *Id.* (citations omitted).

[161]  *Id.*

[162]  *Id.* (citation omitted).

[163]  *See Ex parte Burkett*, No. 68,232-02.

violating independent and adequate state procedural rules that prohibit abuse of the writ. Alternatively, the respondent maintains that if the claims are not procedurally barred, Burkett is not entitled to relief.  The parties' contentions are addressed below.

## II.    The Standard of Review

Federal habeas corpus proceedings filed after April 24, 1996 are governed by provisions of the Antiterrorism and Effective Death Penalty Act (the "AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996).  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997).  The AEDPA was enacted, at least in part, to ensure comity, finality, and deference to state-court determinations by limiting the scope of collateral review and raising the standard for federal habeas relief.  *See Robertson v. Cain*, 324 F.3d 297, 306 (5th Cir. 2003) (citations omitted).  As the Supreme Court has explained, the federal habeas corpus statutes amended by the AEDPA, codified at 28 U.S.C. § 2254(d), set forth a "highly deferential standard for evaluating state-court rulings . . . , which demands that state court decisions be given the benefit of the doubt."  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (internal citation omitted).  Specifically, the AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state court convictions are given effect to the extent possible under law."  *Bell v. Cone*, 535 U.S. 685, 693 (2002) (quotation omitted).

For claims that were adjudicated on the merits in state court, AEDPA provides that a petitioner is not entitled to relief in federal court unless he shows that the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]"  28 U.S.C. § 2254(d)(1).  A state court's decision is contrary to clearly established federal law if it reaches a legal conclusion in direct

conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court based on materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 404-08 (2000); *Avila v. Quarterman*, 560 F.3d 299, 304 (5th Cir. 2009). A state court unreasonably applies clearly established precedent if it identifies the correct governing legal principle but unreasonably applies that principle to the facts of the case. *Brown v. Payton*, 544 U.S. 133, 141 (2005). Under this standard, an unreasonable application is more than merely incorrect or erroneous; rather, the state court's application of clearly established law must be "objectively unreasonable." *Williams*, 529 U.S. at 409.

As this deferential standard shows, the federal habeas corpus scheme of review requires petitioners first to present their claims in state court and exhaust all state court remedies. *See* 28 U.S.C. § 2254(b). "To satisfy the exhaustion requirement, the petitioner must fairly present the substance of his federal claim to the highest state court." *Ries v. Quarterman*, 522 F.3d 517, 523 (5th Cir. 2008). If a claim has not been presented in state court and adjudicated in a proper manner, federal review is procedurally barred if the last state court to consider the claim expressly and unambiguously based its denial of relief on an independent and adequate state-law ground. *Cone v. Bell*, — U.S. —, 129 S. Ct. 1769, 1780 (2009) (citing *Coleman v. Thompson*, 501 U.S. 722, 729 (1991); *Lee v. Kemna*, 534 U.S. 362, 375 (2002)). The doctrine of procedural default prevents habeas review when a petitioner has failed to meet state procedural requirements for presenting his federal claims, thereby depriving the state courts of an opportunity to address those claims in the first instance. *See Cone*, — U.S. —, 129 S. Ct. at 1780 (noting that, "[w]hen a petitioner fails to properly raise his federal claims in state court, he deprives the State of 'an opportunity to address

those claims in the first instance' and frustrates the State's ability to honor his constitutional rights") (quoting *Coleman*, 501 U.S. at 732).

As outlined above, the state habeas corpus court made a series of fact findings about Burkett's evidence. The state habeas corpus court also made credibility determinations. The Texas Court of Criminal Appeals dismissed the petition as an "abuse of the writ" and a frivolous application, based on the trial court's findings that Burkett presented false evidence in support of his claims. On federal habeas corpus review, a state court's findings of fact are presumed correct and the petitioner has the burden of rebutting this presumption with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). This presumption of correctness extends not only to express findings of fact, but to the implicit findings of the state court as well. *See Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006) (citations omitted). Burkett's claims are discussed below, beginning with the respondent's contention that review is procedurally barred by his abuse of the writ in state court.

## III.   Procedural Default

The respondent maintains that Burkett's petition is barred from review by procedural default because the state court habeas application in which he attempted to exhaust his current claims was dismissed as an abuse of the writ. The state habeas corpus court found that Burkett submitted false evidence in support of his claims. Based on these findings, the Texas Court of Criminal Appeals concluded that Burkett abused the writ, in violation of longstanding Texas law, and had filed a "frivolous lawsuit." *See Ex parte Burkett*, 2007 WL 4126375, *1 (Tex. Crim. App. 2007) (citing *Ex parte Jones*, 97 S.W.3d 586 (Tex. Crim. App. 2003); *Middaugh v. State*, 683 S.W.2d 713 (Tex. Crim. App. 1985); *Ex parte Emmons*, 660 S.W.2d 106 (Tex. Crim. App. 1983)).

26

The state court's findings are presumed correct for purposes of federal habeas corpus review. Burkett has the burden of rebutting them with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Burkett does not present any evidence, much less evidence of a clear and convincing character, to rebut the state court's findings.[164] Based on the finding that Burkett submitted false evidence in support of his claims, the Court of Criminal Appeals dismissed Burkett's state habeas corpus application as an abuse of the writ, without reaching the merits.

### A.     Abuse of the Writ as a Procedural Default

The Supreme Court has emphasized that, under the doctrine of procedural default, "federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" *Cone v. Bell*, — U.S.—, 129 S. Ct. 1769, 1780 (2009) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991); *Lee v. Kemna*, 534 U.S. 362, 375 (2002)). To be independent of the federal question, a state-court decision must rely upon a state-law ground, such as a procedural default, that is separate from the federal law supporting the merits of the claim. *See Coleman*, 501 U.S. at 729-730. The Supreme Court has held that "when a petitioner fails to raise his federal claims in compliance with relevant state procedural rules, the state court's refusal to

---

[164] Instead, Burkett objects that the findings were entered without a live hearing. The state habeas corpus court presided over lengthy jury trials for both Burkett and his codefendant, Michael Perry. The Fifth Circuit has recognized that the presumption of correctness found in § 2254(e)(1) is especially strong when, as here, the trial court and the state habeas court are the same. *See Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000); *Boyle v. Johnson*, 93 F.3d 180, 186 (5th Cir. 1996) (citing *May v. Collins*, 955 F.2d 299, 314 (5th Cir. 1992)). A "state habeas judge's findings may be entitled to deference even after a paper hearing when the same judge presided over both the trial and habeas proceedings." *Hudson v. Quarterman*, 273 F. App'x 331, 335, 2008 WL 1708998,*3 (5th Cir. 2008). Burkett does not show that the fact findings are unworthy of deference in this case.

adjudicate the claim ordinarily qualifies as an independent and adequate state ground for denying federal review." *Cone*, 129 S. Ct. at 1780 (quoting *Coleman*, 501 U.S. at 731).

Burkett does not dispute that his claims were dismissed pursuant to an independent and adequate state ground. He concedes that the dismissal constitutes a procedural default. (Docket Entry No. 35). In dismissing Burkett's state habeas application as an abuse of the writ, the Texas Court of Criminal Appeals relied on Texas law and did not consider or decide the merits of Burkett's claims. It is well established that "[Texas' abuse-of-the-writ] doctrine is a valid state procedural bar foreclosing federal habeas review." *Moore v. Quarterman*, 534 F.3d 454, 463 (5th Cir. 2008) (quoting *Coleman v. Quarterman*, 456 F.3d 537, 542 (5th Cir. 2006)); *see also Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008) ("[The Fifth Circuit] has held that, since 1994, the Texas [abuse-of-the-writ] doctrine has been consistently applied as a procedural bar, and that it is an independent and adequate state ground for the purpose of imposing a procedural bar.") (citations omitted). The state court's decision was independent of federal law. *See Stewart v. Smith*, 536 U.S. 856, 860 (2002). As noted, Burkett concedes both independence and adequacy. *See Stokes v. Anderson*, 123 F.3d 858, 860 (5th Cir. 1997). Burkett's claims are barred from review by the doctrine of procedural default unless he shows that an exception applies.

### B.    Exceptions to the Procedural Bar

Under some circumstances, a petitioner may overcome his procedural default and obtain federal habeas corpus review of his claims. If a petitioner has defaulted his federal claims, habeas review is available if he can demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman*, 501 U.S. at 750. If a petitioner is unable to show cause and prejudice, he can obtain habeas review only if he can show that applying the procedural

bar would constitute a fundamental miscarriage of justice.  *See House v. Bell*, 547 U.S. 518, 536 (2006); *see also Murray v. Carrier*, 477 U.S. 478 (1986) (recognizing a narrow exception to the cause-and-prejudice requirement when a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense).

Burkett, who represented himself on state habeas corpus review, does not attempt to show cause for his procedural default.  (Docket Entry No. 35).  Nor does he attempt to establish actual prejudice.  Instead, Burkett argues that a fundamental miscarriage of justice would result if his claims were procedurally barred from federal review because he is actually innocent.

### C.    Actual Innocence as an Exception to the Procedural Bar

To fit within the fundamental-miscarriage-of-justice exception, a habeas petitioner who has defaulted his federal claims must show that, as a factual matter, "he did not commit the crime of conviction."  *Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir. 1999) (citations omitted).  The petitioner must support his allegations with new, reliable evidence that was not presented at trial and must show that it was "more likely than not that no reasonable juror would have convicted him in the light of the new evidence."  *Schlup v. Delo*, 513 U.S. 298, 315 (1995).  Examples of new, reliable evidence that may establish factual innocence include exculpatory scientific evidence, credible declarations of guilt by another, trustworthy eyewitness accounts, and certain kinds of physical evidence.  *See id*. at 324.

As proof of his actual innocence, Burkett points to the same affidavits from Kristin Willis, Megan Lazrine, Kathy Lazrine, Michael Perry, and his family members that were rejected as false on state habeas corpus review.  In that proceeding, the state court found that the affidavits presented in support of Burkett's actual-innocence claim were "false."  The state court's factfindings are

29

presumed correct on federal habeas corpus review.  Burkett has not rebutted any of those findings with clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  These affidavits cannot support Burkett's claim of actual innocence.

Burkett also points to testimony given by Kristin Willis in Michael Perry's trial.  (Docket Entry No. 8).  Burkett notes that Willis's testimony at Perry's trial was different from the testimony given at his trial and that she gave more than one statement to police.  Burkett maintains that because Willis told different stories about what happened on October 24, 2001, she committed perjury at his trial.  (Docket Entry No. 35).  The record reflects that Kristin Willis admitted giving several statements to police and that she was cross-examined at length at both trials.  Contradictory trial testimony under such circumstances establishes a credibility question for the jury, but "[c]onflicting or inconsistent testimony is insufficient to establish perjury." *Kutzner v. Johnson*, 242 F.3d 605, 609 (5th Cir. 2001) (citing *Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990)).  *Koch*, 907 F.2d at 531 (citing *Little v. Butler*, 848 F.2d 73, 76 (5th Cir. 1988) (inconsistencies in witnesses' testimony at trial are to be resolved by trier of fact and do not suffice to establish that certain testimony was perjured)).  The transcript of Willis's testimony does not raise a question as to perjury or show that Burkett is innocent.

Burkett also points to an unsigned document that purports to have been prepared by an "investigator" for the purpose of "attacking the collection of autopsy evidence." (Docket Entry No. 16).  The unsigned report is accompanied by unauthenticated photocopies of weather data, an article about insect activity and decomposition, notes about the "[l]ife cycle of a fly," a copy of Michael Perry's confession to police, a copy of Kristin Willis's work time-sheet from the week of October 23, 2001, and several maps of the Conroe area.  Burkett argues that this new evidence shows that

Sandra Stotler was killed on or about October 26 or 27, 2001, rather than October 24, 2001.  As the respondent observes, the information that Burkett presents in support of this report was available before trial and is not "new."  The report that Burkett presents in support of his proposed claim does not bear any indicia of reliability.  Burkett's exhibits are not close to the kind of new, reliable evidence that is required to establish factual innocence.  *See Schlup*, 513 U.S. at 324.

The State presented overwhelming evidence of Burkett's guilt at his trial.  Burkett does not refute the testimony given by his former roommate, Victor Neal, which established that Burkett and Perry planned to steal a car and looked for one to steal while armed with a loaded shotgun.  Burkett does not disagree that he and Perry talked about disposing of evidence in Crater Lake, where Sandra Stotler's body was later found.  Burkett does not refute testimony from multiple witnesses who saw him driving Sandra Stotler's white Isuzu Rodeo on the night of October 24, 2001. Nor does Burkett dispute that he told several people a tale about purchasing the Rodeo and a Camaro after winning $7,000 on a scratch-off lottery ticket.

Burkett attempts to contest the testimony given by Shane Atkinson.  Burkett confessed to Atkinson that he and Perry murdered a woman and two boys to steal their cars.  Burkett argues that Atkinson was not a credible witness.  Burkett's admission to Atkinson, however, matches evidence recovered by police.  The admission also corresponds to the testimony of other witnesses, including Ian McCoin, who heard Burkett brag about making the front page of the *Conroe Courier* when Sandra Stotler's unidentified body was recovered from Crater Lake.  Burkett's account is also consistent with the confession Michael Perry gave shortly after his arrest.[165] (Docket No. 16, Exhibit

---

[165]  Burkett's admission about the offense, as relayed to Shane Atkinson, mirrors the account give by Perry, whose tape-recorded and written confession that was admitted at his trial.  Perry's confession, which also

(continued...)

B1, Michael Perry's written confession).  Burkett's argument that Atkinson's testimony was not worthy of belief at most presented an issue for the jury.  The jury found Atkinson credible.  Burkett presents no evidence of actual innocence.

Based on this record, Burkett does not present new, reliable proof of his innocence or evidence that "raise[s] sufficient doubt about [his] guilt to undermine confidence in the result of the trial without the assurance that [his] trial was untainted by constitutional error[.]"  *Schlup*, 513 U.S. at 317.  Burkett has not satisfied the fundamental-miscarriage-of-justice exception and that his claims are barred by the doctrine of procedural default.

## IV.    Analysis of the Merits

Liberally construed,[166] Burkett raises five claims: (1) actual innocence of the charged offense; (2) prosecutorial misconduct; (3) due process violations in the jury instruction on law of the parties; (4) ineffective assistance of counsel at trial; and (5) ineffective assistance of counsel on appeal.  The Texas Court of Criminal Appeals rejected Burkett's entire application as frivolous, finding that the evidence in support of the claims was false.  The state habeas corpus court also rejected these claims on state habeas corpus review, concluding that the claims were without merit.

---

[165](...continued)
details his account of Burkett's participation, was published in the state court's appellate opinion.  *See Perry v. State*, 158 S.W.3d 438, 440-42 (Tex. Crim. App. 2004).  In essence, Perry admitted that he killed Mrs. Stotler by shooting her twice with a shotgun.  *See id.* at 440.  Thereafter, Perry and Burkett dumped Mrs. Stotler's body in Crater Lake.  *See id.* at 440-41.  Unable to find the keys for the Camaro, he and Burkett lured Adam Stotler, who was driving the Izusu Rodeo, to a wooded area.  *See id.* at 441.  Perry claimed that Burkett shot Adam and his friend, Jeremy.  *See id.*  After taking Adam's keys and wallet, Perry returned to the Stotler home and took the Camaro, while Burkett took the Isuzu Rodeo.  *See id.* at 441-42.

[166]  Burkett's petition is subject to the liberal construction accorded to *pro se* pleadings.  *See Haines v. Kerner*, 404 U.S. 519 (1972)

Assuming that this constitutes an adjudication on the merits, Burkett's claims are addressed below under the standard of review set by 28 U.S.C. § 2254(d).[167]

### A.    Actual Innocence

Burkett's primary claim is that he is actually innocent of the offense of capital murder.  In support of this claim, Burkett relies mainly on the affidavits of Kristin Willis, Megan Lazrine, and Michael Perry, as well as the statements provided by his mother and brother on state habeas corpus review.  Burkett maintains that this evidence exonerates him and that he is entitled to relief.  Burkett cannot prevail on this claim.

As the respondent correctly notes, claims of actual innocence are not cognizable on federal habeas corpus review.  "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."  *Herrera v. Collins*, 506 U.S. 390, 400 (1993).  Rather, a claim of actual innocence is "a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."  *Id.* at 404.  Burkett has failed to show that he fits through the gateway exception to the procedural bar by presenting new, reliable evidence of his actual innocence.  *Schlup v. Delo*, 513 U.S. 298, 324 (1998).

Even assuming that a stand-alone claim of actual innocence is cognizable, Burkett fails to meet the more stringent standard of proof needed to make such a claim under *Herrera v. Collins*. The Supreme Court has described the threshold for any "hypothetical freestanding innocence claim" as "extraordinarily high."  *House v. Bell*, 547 U.S. 518, 555 (2006).  Such a showing would require

---

[167]  Even if the court were to apply the less deferential pre-AEDPA standard of *de novo* review, Burkett fails to demonstrate that his conviction was tainted by a constitutional violation or that he is otherwise entitled to relief.

"more convincing proof of innocence" than the gateway standard for overcoming a procedural bar found in *Schlup v. Delo*. *House*, 547 U.S. at 555 (comparing the *Schlup* and *Herrera* standards). As outlined above, the state habeas corpus court rejected all of the affidavits and statements provided by Burkett as "false" and concluded that his actual-innocence claim was frivolous. Burkett does not make any showing that the state court's findings were incorrect. Absent clear and convincing evidence that the state court's findings were erroneous, the presumption of correctness applies. 28 U.S.C. § 2254(e)(1). Based on this record, Burkett falls far short of the threshold set in *Herrera*. Burkett is not entitled to federal habeas corpus relief based on his allegations of actual innocence.

### B.    Prosecutorial Misconduct

Burkett also alleges that the trial prosecutor engaged in misconduct by coercing false testimony and knowingly sponsoring perjury from Kristin Willis and Megan Lazrine. If the prosecution knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected, that violates due process. *Giglio v. United States*, 405 U.S. 150 (1972); *Napue v. Illinois*, 360 U.S. 264 (1959); *Faulder v. Johnson*, 81 F.3d 515, 519 (5th Cir.), *cert. denied*, 519 U.S. 995 (1996). A petitioner asserting habeas relief on this basis must show that: (1) the testimony was actually false, (2) the prosecutor knew it was false, and (3) the testimony was material. *Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993).

In support of this claim, Burkett relies on the purported affidavits from Willis, Megan Lazrine, and Cathy Lazrine. The state habeas corpus court found that these affidavits were "false" and that Burkett had "no evidence in support of his claims of prosecutorial misconduct." *Ex parte Burkett*, No. 68,232-01 at 554. The state habeas corpus court noted further that it was "familiar with

the performance of the trial prosecutors in this case, Robert Bartlett and Michael Griffin, as both have effectively prosecuted cases in the 221st District Court and the courts of Montgomery County for many years." *Id.* The state habeas corpus court found that the affidavits provided by Robert Bartlett and Michael Griffin, both of whom denied coercing or sponsoring any false testimony, to be "credible." *Id.* Burkett offers no evidence to rebut these findings. The state habeas corpus court's findings and credibility determinations are presumed correct. 28 U.S.C. § 2254(e)(1).

Burkett provides no valid support for his claim of prosecutorial misconduct and the record does not disclose any. Absent a showing that the testimony at issue was actually false and that the prosecutor knew it was false, Burkett has failed to establish a constitutional violation. He is not entitled to relief on this claim.

### C.   The Jury Instruction on the Law of Parties

Burkett complains that the instructions, which advised the jury that it could find him guilty of capital murder as a principal or as a party based on the law of conspiracy under § 7.02 of the Texas Penal Code, violated his constitutional right to due process. At the time of the offense, Texas law provided that an individual could be held criminally responsible for the conduct of another, as a party to an offense, under the law of conspiracy. Section 7.02 stated:

> If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

TEX. PENAL CODE § 7.02(b).

The record shows that the jury in Burkett's case was given an instruction on conspiracy liability consistent with the statute. The jury was also informed that capital murder, murder, and

robbery are felonies.  *See* CR, vol. 3, at 416.  The jury was further informed that it could find Burkett

guilty of capital murder as an individual or as a party based on the law of conspiracy.   The

instructions stated:

> [Now,] if you find from the evidence beyond a reasonable
> doubt that on or about October 24, 2001, in Montgomery County,
> Texas, the defendant JASON AARON BURKETT, conspired with
> Michael James Perry to commit robbery, and that Michael James
> Perry did then and there intentionally or knowingly cause the death
> of Sandra Stotler by shooting Sandra Stotler with a deadly weapon,
> to wit: firearm, and that you further find from the evidence beyond a
> reasonable doubt that on or about October 24, 2001, in Montgomery
> County, Texas, and pursuant to the same scheme or course of
> conduct, Michael James Perry, did then and there intentionally or
> knowingly cause the death of James Adam Stotler or Arnold Jeremy
> Richardson with a deadly weapon, to wit: a firearm, and you further
> find that the said shooting of Sandra Stotler and James Adam Stotler
> or Arnold Jeremy Richardson by Michael James Perry was done in
> furtherance of the conspiracy to commit robbery and should have
> been anticipated as a result of the carrying out of the conspiracy; **OR**

> if you find from the evidence beyond a reasonable doubt that
> on or about October 24, 2001, in Montgomery County, Texas, the
> defendant JASON AARON BURKETT, conspired with Michael
> James Perry to commit robbery, and that the defendant, JASON
> AARON BURKETT, did then and there intentionally or knowingly
> cause the death of Sandra Stotler by shooting Sandra Stotler with a
> deadly weapon, to wit: firearm, and that you further find from the
> evidence beyond a reasonable doubt that on or about October 24,
> 2001, in Montgomery County, Texas, and pursuant to the same
> scheme or course of conduct, Michael James Perry, did then and there
> intentionally or knowingly cause the death of James Adam Stotler or
> Arnold Jeremy Richardson with a deadly weapon, to wit: a firearm,
> and you further find that the said shooting of Sandra Stotler and
> James Adam Stotler or Arnold Jeremy Richardson by Michael James
> Perry was done in furtherance of the conspiracy to commit robbery
> and should have been anticipated as a result of the carrying out of the
> conspiracy;  **OR**

> if you find from the evidence beyond a reasonable doubt that
> on or about October 24, 2001, in Montgomery County, Texas, the
> defendant JASON AARON BURKETT, conspired with Michael

36

James Perry to commit robbery, and that Michael James Perry did then and there intentionally or knowingly cause the death of Sandra Stotler by shooting Sandra Stotler with a deadly weapon, to wit: firearm, and that you further find from the evidence beyond a reasonable doubt that on or about October 24, 2001, in Montgomery County, Texas, and pursuant to the same scheme or course of conduct, the defendant, JASON AARON BURKETT, did then and there intentionally or knowingly cause the death of James Adam Stotler or Arnold Jeremy Richardson with a deadly weapon, to wit: a firearm, and you further find that the said shooting of Sandra Stotler and James Adam Stotler or Arnold Jeremy Richardson by the defendant, JASON AARON BURKETT, was done in furtherance of the conspiracy to commit robbery and should have been anticipated as a result of the carrying out of the conspiracy [. . .]

then you will find the defendant, JASON AARON BURKETT, guilty of Capital Murder as charged in the indictment.

CR, vol. 3, at 420-22 (emphasis in original).  Burkett complains that this jury instruction on the Texas law of parties violated his constitutional right to due process by: (1) "expanding the theories upon which the [s]tate could obtain the conviction" without providing the requisite notice in an indictment; and (2) "lower[ing] the burden of proof that the [s]tate had to meet to obtain the conviction."  Both arguments are without merit.

### 1.     The Law of Parties is Not an Offense but a Theory of Criminal Liability that is not Required to be Pleaded in an Indictment

"A defendant's right to notice of the charges against which he must defend is well established."  *Gray v. Netherland*, 518 U.S. 152, 164 (1996) (citations omitted); *see also Ables v. Scott*, 73 F.3d 591, 593 (5th Cir. 1996) ("Due Process requires that a criminal defendant have notice of the charges against him so he can be prepared to defend himself at trial.") (citing *Cole v. Arkansas*, 333 U.S. 196, 201 (1948)).  A defendant's right to receive notice of the charges against

37

him is guaranteed by the Sixth and the Fourteenth Amendment.[168]  *See McKay v. Collins*, 12 F.3d 66, 69 (1994); *see also Tarpley v. Estelle*, 703 F.2d 157, 160-61 (5th Cir. 1983) (discussing whether jury instructions violated the defendant's Sixth and Fourteenth Amendment right to notice of the charges).  The Texas Constitution also guarantees an accused the right to be informed of "the nature and cause of the accusation against him" in a criminal prosecution.  TEX. CONST. art. I, § 10.  The Texas Constitution further requires that, unless waived by the defendant, all felony offenses must be prosecuted pursuant to a grand jury indictment.  *See id.*; *Teal v. State*, 230 S.W.3d 172, 174 (Tex. Crim. App. 2007); *see also* TEX. CODE CRIM. PROC. art. 1.05 ("No person shall be held to answer for a felony unless on indictment of a grand jury.").

Burkett maintains that, to comport with the notice requirement, the State was required to allege in the indictment that he could be liable as a party to the offense.  To afford sufficient notice, an indictment must allege "[t]he essential elements of the offense, including knowledge or intent."[169] *McKay*, 12 F.3d at 69 (citation omitted).  It is well settled in Texas that the law of parties found in

---

[168]  The right to a grand jury indictment, found in the Fifth Amendment Due Process Clause, has not been incorporated and made applicable to the states through the Fourteenth Amendment Due Process Clause.  *See McDonald v. City of Chicago*, — U.S. —, 130 S. Ct. 3020, 3035 & n.13 (2010) (listing all of the Bill of Rights protections and noting that "[o]nly a handful," including "the Fifth Amendment's grand jury indictment requirement," remain unincorporated).

[169]  Ordinarily, the sufficiency of an indictment is governed by state law and is not amenable to federal habeas corpus review.  The Fifth Circuit has emphasized that "the sufficiency of a state indictment is not a matter for federal habeas corpus relief unless it can be shown that the indictment is so defective that the convicting court had no jurisdiction."  *Evans v. Cain*, 577 F.3d 620, 624 (5th Cir. 2009) (citing *Branch v. Estelle*, 631 F.2d 1229, 1233 (5th Cir. Unit A 1980) (emphasis added); *see also McKay v. Collins*, 12 F.3d 66, 68 (5th Cir. 1994) (same)).  When a state court has held that an indictment is sufficient under state law, a federal court need not address that issue.  *Evans*, 577 F.3d at 624 (quoting *McKay*, 12 F.3d at 68).  The state habeas corpus court did not directly address Burkett's due process claim, finding that it was "not cognizable" on habeas review because he had failed to raise it on direct appeal.  *Ex parte Burkett*, No. 68,232-01 at 557.  Instead, the state court rejected Burkett's claim concerning the law of parties, and his allegations of insufficient notice, by finding that his appellate attorney was not deficient for failing to raise this claim on direct appeal.  *See id.* at 556, 557.  Because the state courts did not squarely address the sufficiency of the indictment, this court considers the issue to determine whether he received adequate notice for purposes of due process.

§ 7.02(b) of the Texas Penal Code is not an element of an offense and need not be pleaded in the indictment. *See Marable v. State*, 85 S.W.3d 287, 287-88 (Tex. Crim. App. 2002) (citations omitted). "It is well accepted that the law of parties may be applied to a case even though no such allegation is contained in the indictment." *Montoya v. State*, 810 S.W.2d 160, 165 (Tex. Crim. App. 1989) (citing *English v. State*, 592 S.W.2d 949 (Tex. Crim. App. 1980); *Pitts v. State*, 569 S.W.2d 898 (Tex. Crim. App. 1978)). In rejecting an argument similar to the one raised by Burkett, the Texas Court of Criminal Appeals explained that a jury instruction with "an alternative 'parties' charge" under § 7.02(b) is not asking the jury to consider whether the defendant was guilty of the separate offense of criminal conspiracy under § 15.02. *Montoya v. State*, 810 S.W.2d at 165.

Burkett does not dispute that he received a copy of the indictment, which alleged capital murder. Burkett does not show that the indictment was insufficient to charge an offense. More importantly, Burkett does not demonstrate that the law of parties, as a theory of liability, was required to be alleged in the charging instrument. Absent a showing that Burkett was denied notice of the charges against him, or that he was otherwise deprived of the right to due process, he fails to state a claim for which relief can be granted on federal habeas corpus review.

### 2. The Jury Instruction on the Law of Parties Did Not Alter the State's Burden of Proof

The Fourteenth Amendment Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). Burkett alleges that the instruction on the law of parties reduced the State's burden of proof from "intentionally and knowingly" committing murder to whether the murders were merely "foreseeable." Texas courts have rejected this argument. Texas courts hold that § 7.02(b) does not lack a mens rea component or eliminate

39

the State's burden of proving the requisite culpable mental state.  *See Cienfuegos v. State*, 113 S.W.3d 481, 493-94 (Tex. App. — Houston [1st Dist.] 2003, pet. ref'd); *Gravis v. State*, 982 S.W.2d 933, 938 (Tex. App. — Austin 1998, pet. ref'd).

The jury instructions required the State to prove beyond a reasonable doubt that, while conspiring to commit robbery with Michael Perry, Burkett intentionally or knowingly committed murder.  The record contains ample evidence showing that Burkett and Perry agreed to commit robbery by stealing Sandra Stotler's vehicles and that — as a principal or as a party — Burkett intentionally or knowingly caused the deaths of Sandra Stotler, Adam Stotler, and Jeremy Richardson during the course of that offense.  Based on this record, Burkett does not show that the jury instruction on the law of parties was improper or that it was erroneous, given the evidence presented at his trial.  Absent a showing that the jury instruction on the law of parties resulted in fundamental error, Burkett does not demonstrate a valid claim for relief.

### D.      Ineffective Assistance of Counsel at Trial

Burkett argues that he was denied his constitutional right to effective assistance of counsel at his trial.  Burkett complains that his trial attorneys failed to present testimony from family members in support of an alibi defense.  Burkett also complains that his attorneys failed to interview Megan Lazrine before trial.  The state habeas corpus court rejected both claims, finding that Burkett "suborned perjury" in support of his proposed alibi and that his attorneys were not deficient.  *Ex parte Burkett*, No. 68,232-01 at 554-55.

The Sixth Amendment guarantees criminal defendants the right to have the assistance of counsel at trial.  *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003).  This guarantee includes "the right to the effective assistance of counsel."  *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970).

40

Claims for ineffective assistance of counsel are analyzed under the well-established standard set in *Strickland v. Washington*, 466 U.S. 668 (1984).  To prevail under the *Strickland* standard, a defendant must demonstrate both constitutionally deficient performance by counsel and actual prejudice as a result of the alleged deficiency.  *See Williams v. Taylor*, 529 U.S. 390, 390-91 (2000).  "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that rendered the result unreliable."  *Strickland*, 466 U.S. at 687.

Counsel's performance is constitutionally deficient if it falls below an objective standard of reasonableness.  *See id.* at 687-88.  To demonstrate deficient performance on his counsel's part, a petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.* at 687.  "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms."  *Id.* at 688.  "Judicial scrutiny of counsel's performance must be highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  That is, the defendant must overcome the presumption that, under the circumstances, "the challenged action might be considered sound trial strategy."  *Riley v. Dretke*, 362 F.3d 302, 305 (5th Cir. 2004).

Deficient performance, standing alone, is not sufficient under *Strickland*.  Once a petitioner establishes error by his defense counsel, he must still demonstrate actual prejudice as a result of his counsel's deficient performance.  Performance is prejudicial only if there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  A "reasonable probability" in this context is "a

probability sufficient to undermine confidence in the outcome." *Id*.  Burkett, who complains that

his trial attorneys failed to present testimony from family members or to interview one of the State's

witnesses, does not establish deficient performance or actual prejudice in this case.

> **1.    The Claim Based on Failing to Present Testimony from Family Members**

Burkett complains that his attorneys were deficient because they did not present testimony

from his mother, Kathryn Burkett, or his brother, Christopher Burkett, at trial.  According to the

affidavits Burkett provided, these family members would have testified that he was working for a

man named Grady Page on October 24, 2001, and could not have been with Michael Perry on the

day the murders occurred.  Burkett maintains that his attorneys were deficient for failing to present

this testimony in support of an alibi defense.

The Fifth Circuit has repeatedly held that complaints of uncalled witnesses are not favored

on federal habeas corpus review "because the presentation of testimonial evidence is a matter of trial

strategy and because allegations of what a witness would have stated are largely speculative." *Day

v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) (citation omitted).  To prevail on an ineffective-

assistance claim based on counsel's failure to call a witness, the petitioner "must name the witness,

demonstrate that the witness was available to testify and would have done so, set out the content of

the witness's proposed testimony, and show that the testimony would have been favorable to a

particular defense." *Id*. (citations omitted).  When the only evidence of a missing witness's

testimony is from the petitioner, the Fifth Circuit "views claims of ineffective assistance with great

caution." *Sayre v. Anderson*, 238 F.3d 631, 635-36 (5th Cir. 2001) (citations and quotations

omitted).  This case illustrates why such caution is necessary.

As outlined above, Burkett's attorneys provided affidavits on state habeas corpus review. According to these affidavits, Burkett "never stated his exact whereabouts at the time of the murders," *Ex parte Burkett*, No. 68,232-01 at 313 (affidavit of Frank Blazek), 322 (affidavit of Stephen D. Jackson), and neither Kathryn Burkett nor Christopher Burkett ever claimed to know where Burkett was at the time of the murders. *Id.* In addition, the State submitted an affidavit from Grady Page stating that Burkett had previously worked for him did not do so on October 24, 2001, when the murders occurred. *Id.* at 463.

The Texas habeas court found that Burkett's attorneys provided "credible" affidavits in response to his allegations of ineffective assistance. *Ex parte Burkett*, No. 68,232-01 at 554. Based on these credible affidavits, the Texas court found that Burkett "never told counsel his alibi defense that he was working at the time of the murders." *Id.* at 555. The Texas court found further that "[Burkett] was not working for Grady Page at the time of the murders." *Id.* at 554. The Texas court also found that the proposed testimony from Kathryn Burkett and Christopher Burkett was "false." *Id.* The court concluded that Burkett "commit[ted] perjury in pleading, and suborn[ed] perjury in the proof of, his claim that counsel failed to present [an] alibi defense that he was working." *Id.* at 556.

The state habeas corpus court's factfindings and credibility determinations are entitled to deference, absent clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); *Galvan v. Cockrell*, 293 F.3d 760, 764 (5th Cir. 2002). Burkett has made no effort to rebut the factfindings and credibility determinations made by the state habeas corpus court in connection with his ineffective-assistance claims. The state court's findings and determinations are presumed correct and entitled to deference.

Because the purported affidavits Burkett presented in support of this alibi defense were proven false, he cannot establish that his counsel was deficient for failing to present this testimony at trial. As the Supreme Court has observed, "the right to counsel includes no right to have a lawyer who will cooperate with planned perjury." *Nix v. Whiteside*, 475 U.S. 157, 173 (1986). "A lawyer who would so cooperate would be at risk of prosecution for suborning perjury, and disciplinary proceedings, including suspension or disbarment." *Id.* Burkett does not show that he had a legitimate alibi defense and cannot demonstrate that his attorneys were ineffective for failing to present the proposed testimony. Burkett's ineffective-assistance claim on this issue is without merit.

### 2.      Failure to Interview Megan Lazrine

Burkett claims that his attorneys were deficient for failing to interview Megan Lazrine before trial. Burkett contends that, if his attorneys had interviewed her, she would have told them that the lead prosecutor, Robert Bartlett, had engaged in prosecutorial misconduct by threatening her and coercing her to lie. In support of this claim, Burkett relies on the affidavit that was purportedly signed by Cathy Lazrine and submitted on state habeas corpus review. As outlined above, the state court found that this affidavit was "false." *Ex parte Burkett*, No. 68,232-01 at 553. Burkett does not show otherwise. Nor does he show that his attorneys were deficient for failing to interview Cathy or Megan Lazrine.

In their affidavits to the state habeas corpus court, neither one of Burkett's attorneys could recall whether he personally interviewed Megan Lazrine or whether the defense investigator did so. *Ex parte Burkett*, No. 68,232-01 at 320 (supplemental affidavit of Frank Blazek), 323 (affidavit of Stephen D. Jackson). Defense counsel Stephen D. Jackson observed, however, that the file

44

contained "typed notes" of an interview with Megan Lazrine, which disclosed information

unfavorable to Burkett:

> . . . Megan Lazrine claims that she overheard both Perry and
> [Burkett] state that they were on the front page of the newspaper, then
> she stated that she knew that Perry stated this but could not recall if
> [Burkett] said this, and that [Burkett] stated that he shot someone.
> [Burkett] told Lazrine, "I shot them and took off running."  A couple
> days later, [Burkett] came up to her with a newspaper and said, "We
> made the front page."  Further she told us that [Burkett] gave her a
> shotgun shell and said to her that she could use the shell to remember
> them by.

*Ex parte Burkett*, No. 68,232-01 at 323.  The state habeas corpus court found that the attorneys'

affidavits were credible, that counsel interviewed Megan Lazrine before trial, and that Burkett's

attorneys were not deficient.  *Ex parte Burkett*, No. 68,232-01 at 554.

Burkett does not refute the state court's finding that defense counsel interviewed Megan

Lazrine before trial or the credibility determinations made in connection with the decision to reject

his ineffective-assistance claim.  Absent a showing that defense counsel failed to interview this

witness, and that his defense was actually prejudiced as a result, Burkett does not raise a

constitutional violation.  More importantly, Burkett fails to demonstrate that the state court's

decision to reject his ineffective-assistance claims was contrary to, or involved an unreasonable

application of, the deferential *Strickland* standard.  Burkett is not entitled to relief on this issue.

### E.    Ineffective Assistance of Counsel on Appeal

Burkett complains that he was denied the right to effective assistance on appeal because he

failed to challenge the jury instruction on the law of parties found in § 7.02(b) of the Texas Penal

Code.  In his affidavit to the state habeas corpus court, Burkett's appellate counsel, Jerald D. Crow,

explained that he researched the law of parties as it applied to Burkett's case, but found no viable

issue. *Ex parte Burkett*, No. 68,232-01 at 499-501. The state habeas corpus court rejected Burkett's ineffective-assistance claim and this court does, too, for reasons that do not require lengthy explanation.

A claim of ineffective assistance on appeal requires a habeas petitioner to establish both constitutionally deficient performance and actual prejudice. *See Smith v. Murray*, 477 U.S. 527, 535-36 (1986) (applying *Strickland* to a claim of ineffective assistance of counsel on appeal). To establish that appellate counsel's performance was deficient, the defendant must show that his attorney was objectively unreasonable in failing to find arguable issues to appeal — that is, that counsel unreasonably failed to discover non-frivolous issues and raise them. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). If the defendant succeeds in such a showing, then he must establish actual prejudice by demonstrating a "reasonable probability" that, but for his counsel's deficient performance, "he would have prevailed on his appeal." *Id.*

Burkett cannot make the first showing because he has not shown that the jury instruction on the law of parties was incorrect under § 7.02(b) of the Texas Penal Code or unwarranted by the evidence at his trial. Burkett does not otherwise demonstrate that his counsel had, but failed to raise, a valid claim on appeal. The right to counsel on appeal "does not include the right to bring a frivolous appeal and, concomitantly, does not include the right to counsel for bringing a frivolous appeal." *Robbins*, 528 U.S. at 278. Appellate counsel is not deficient for not raising every nonfrivolous issue on appeal. *United States v. Reinhart*, 357 F.3d 521, 524 (5th Cir. 2004) (citing *United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 2000)). To the contrary, counsel's failure to raise an issue on appeal will be considered deficient performance only when that decision "fall[s] below an objective standard of reasonableness." *Id.* This standard requires counsel "to research

relevant facts and law, or make an informed decision that certain avenues will not prove fruitful." *Id*. "Solid, meritorious arguments based on directly controlling precedent should be discovered and brought to the court's attention." *Id.*

Burkett fails to demonstrate that his appellate attorney's performance was deficient or that he was otherwise denied effective assistance during his appeal. Burkett does not show that the state court's decision to reject this claim was contrary to, or involved an unreasonable application of, the deferential *Strickland* standard. Burkett is not entitled to relief on this claim.

## V.     The Request for an Evidentiary Hearing and to Stay

Burkett requested an evidentiary hearing. (Docket No. 31). He appears to request such a hearing for the primary purpose of confronting and cross-examining Kristin Willis, Megan Lazrine, and Cathy Lazrine about the statements that he provided in support of his state habeas corpus application. Burkett asks for the appointment of a "hand-writing expert" to verify these documents and his claim of actual innocence. He also asks for the appointment of "experts in the field of entomology and anthropology," and to have the bodies of Sandra Stotler, Adam Stotler, and Jeremy Richardson exhumed so that he may explore a challenge to the forensic evidence and testimony presented by the medical examiner at his trial.

Burkett has failed to support any of the claims he asserted. All Burkett's claims were rejected on state habeas corpus review by the same judge who presided over his trial and the trial of the codefendant, Michael Perry. Burkett has not presented any evidence, much less clear and convincing evidence, to refute the state court's finding that his application was based on "false" evidence and "frivolous" claims.

Under 28 U.S.C. § 2254(e)(2), if an applicant "failed to develop the factual basis of a claim in State court proceedings," then the federal habeas corpus court "shall not hold an evidentiary hearing" on the claim unless the applicant shows that:

(A)    the claim relies on —

(i)    a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii)    a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B)    the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2). Burkett has failed to show that he is entitled to a hearing under this statute. Nor has he shown that the state court's decision to deny relief on any of his claims resulted in an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(2).

Whether to conduct an evidentiary hearing is committed to this court's discretion. *See Michael Williams v. Taylor*, 529 U.S. 420, 436 (2000) (stating that it was "Congress' intent to avoid unneeded evidentiary hearings in federal habeas corpus" proceedings); *Robinson v. Johnson*, 151 F.3d 256, 268 (5th Cir. 1998), *cert. denied*, 526 U.S. 1100 (1999). An evidentiary hearing is not required if there are "no relevant factual disputes that would require development in order to assess the claims." *Robinson*, 151 F.3d at 268. This court has been able to resolve all issues raised in this case by referring to the pleadings, the state-court records, including the trial transcripts and exhibits. Burkett's request for an evidentiary hearing is denied.

48

On July 7, 2010, Burkett filed a motion to stay and abate this federal habeas proceeding to challenge the credentials and the credibility of the medical examiner, Dr. Paul Shrode. (Docket Entry No. 37). This court had already granted a stay regarding Burkett's challenge to Dr. Shrode's testimony. (Docket Entry No. 14). The state courts rejected Burkett's claims. *See Ex parte Burkett*, No. 68,232-02 (Tex. Crim. App. Sept. 10, 2008). Because Burkett fails to show that he is entitled to a second stay, the motion to stay and abate is denied.

## VI.   Certificate of Appealability

Under 28 U.S.C. § 2253, a certificate of appealability is required before an appeal may proceed. *See Hallmark v. Johnson*, 118 F.3d 1073, 1076 (5th Cir. 1997) (noting that actions filed under either 28 U.S.C. § 2254 or § 2255 require a certificate of appealability). "This is a jurisdictional prerequisite because the COA statute mandates that '[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals . . . .'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (citing 28 U.S.C. § 2253(c)(1)).

A certificate of appealability will not issue unless the petitioner makes "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), which requires a petitioner to demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Under the controlling standard, this requires a petitioner to show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336. When relief is denied based on procedural grounds, the petitioner must show not only that "jurists of reason would find it debatable

whether the petition states a valid claim of the denial of a constitutional right," but also that they "would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.   A district court may deny a certificate of appealability without requiring further briefing or argument.   *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).   Jurists of reason would not debate whether any procedural ruling in this case was correct or whether the petitioner stated a valid claim of the denial of a constitutional right.   Alternatively, reasonable jurists would not debate whether the petition should have been resolved in a different manner and the issues do not deserve encouragement to proceed further.   This court denies a certificate of appealability.

## VII.   Conclusion

The petition for a writ of habeas corpus, the request for an evidentiary hearing, and the motion for a stay are denied.   This case is dismissed with prejudice.   A certificate of appealability will not issue.   Final judgment is entered by separate order.

SIGNED on August 16, 2010, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

50